PER CURIAM.
Andrew Michael Gosciminski appeals his conviction of first-degree murder and sentence of death for the murder of Joan Loughman in Fort Pierce. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm both the conviction and the sentence.
FACTUAL AND PROCEDURAL HISTORY
Gosciminski was indicted, tried, and convicted of robbery with a deadly weapon, burglary of a dwelling with an assault or battery, and the first-degree murder of Joan Loughman. Loughman was bludgeoned and stabbed and her throat was cut in her father’s residence on Hutchinson Island in Fort Pierce on September 24, 2002. A number of jewelry items, including a two-carat diamond ring, were taken from Loughman. Gosciminski was sentenced to death for Loughman’s murder in 2005.
*688 On appeal, this Court reversed the convictions and the sentences and remanded for a new trial. Gosciminski v. State, 994 So.2d 1018 (Fla.2008). We concluded that several rulings by the trial court relating to questioning by the prosecutor and the admission of hearsay statements constituted prejudicial error that denied Gosciminski a fair trial. Id. at 1027-28.
The evidence presented at Gosciminski’s retrial established the following facts. Joan Loughman flew down to Fort Pierce from Connecticut on September 13, 2002, in order to arrange for her father, Frank Vala, to move into an assisted living facility. Loughman stayed at her father’s residence during her visit to Fort Pierce. As was her custom, Loughman wore all of her jewelry daily. This jewelry included a two-carat diamond ring[1] and several other rings, several bracelets, including a diamond tennis bracelet, and earrings with diamonds and emeralds.
Gosciminski was the director of marketing at Lyford Cove, an assisted living facility. After Loughman met with Goscimin-ski, her father was admitted to Lyford Cove by Gosciminski on September 18, 2002. The day before the father’s admission Gosciminski went to Vala’s home to help Loughman move Vala’s belongings and furniture to Lyford Cove. However, after being at Lyford Cove for just one night, Vala had to be transferred to the hospital. Vala did not return to Lyford Cove and was subsequently transferred to hospice on September 24, 2002. Lough-man arranged to meet Gosciminski at Ly-ford Cove on the evening of September 23, 2002, in order to pick up her father’s belongings. Gosciminski carried Vala’s suitcase to Loughman’s car. That suitcase was still present in Loughman’s rental car, which was parked in the driveway of her father’s house, when the police came to investigate her murder on the evening of September 24.
On the morning of September 24, 2002, Loughman spoke with her twin sister, Janet Vala-Terry, using the telephone at her father’s house. This telephone conversation lasted five minutes and ended at 8:47 a.m. when Loughman told her sister that she had to hang up because someone was at the front door. Loughman did not say who was at the door. Loughman was found dead in the bedroom of her father’s home on the evening of September 24, 2002, by her sister Janet, her brother, and her brother’s wife, who had flown down to Florida in order to meet Loughman at the hospice where Vala had been transferred. Loughman had plans to fly back to Connecticut on September 25, 2002.
On the morning of September 24, 2002, Gosciminski was scheduled to attend a staff meeting at Lyford Cove at 8:00 a.m. However, according to his cell phone records, at 8:15 a.m. Gosciminski called Lois Bosworth, one of the corporate directors of Lyford Cove, to inform her that he would not be able to attend the staff meeting because he was going to Life Care Center in Fort Pierce to make a presentation that morning. Gosciminski arrived at Lyford Cove shortly after lunch on that day. Upon arriving, he met with Debra Flynn, the executive director of the facility, and Nicole Rizzolo, the administrative assistant to Debra Flynn, and showed them a two-carat diamond ring which he removed from a tissue or napkin in his pocket. Gosci-minski had talked about buying a ring for his girlfriend, Debra Thomas, for some time before the murder.
Flynn testified that when Gosciminski arrived at Lyford Cove around 1:30 p.m. *689 on the day of the murder he appeared freshly scrubbed and his hair was slick and freshly combed. Flynn also testified that the ring Gosciminski showed her was a white or platinum band with a round diamond center stone and diamond baguettes on each side. Flynn also testified that the ring looked old and dirty and had “something black” on it. Gosciminski also talked to Flynn and Rizzolo about other jewelry he had for Thomas, including a tennis bracelet. Rizzolo testified that Goscimin-ski came to work sometime after lunch and that he looked like he had just showered and his skin was “scrubbed pink.” Gosci-minski also showed Rizzolo the ring and mentioned a tennis bracelet. On cross-examination, defense counsel pointed to Rizzolo’s deposition in which she had stated that Gosciminski had shown her the ring before the day of Loughman’s murder. Rizzolo stated that although she had said that in her deposition, she was sure that Gosciminski had shown her the ring after Loughman’s murder.
Until a short time before the murder, Gosciminski was dating and living with Debra Thomas. Debra Thomas started having an affair with Ben Thomas[2] in July 2002. At that time, Ben Thomas had been married to Deborah Pelletier for five years and lived with Pelletier in a home on Import Drive in Port St. Lucie. Around the last week of July 2002, Debra Thomas and Ben Thomas moved into the house on Import Drive. One week later, both Debra Thomas and Ben Thomas moved out and Deborah Pelletier moved back into the house. Ben Thomas moved to another house by himself and Debra Thomas moved back with Gosciminski.
During the investigation, Detective Thomas Hickox learned that Gosciminski had been with Loughman the evening before the murder. On October 1, 2002, Detective Hickox went to Lyford Cove to talk to Debra Flynn and Gosciminski. On October 2, 2002, Detective Hickox called Gosciminski to the police station for a recorded interview, in which Gosciminski participated voluntarily. At the same time, two other officers were sent to the new home of Debra Thomas and Goscimin-ski to question Thomas about Loughman’s murder. The detectives asked Thomas about the engagement ring Gosciminski had given her. Thomas stated that it was the same engagement ring Gosciminski had given her during their previous engagement in 2001. At trial, Thomas testified that she had not told the detectives the truth about the ring because she was afraid. She also testified that after the officers left, she got a phone call from Gosciminski stating that they had to get rid of the ring because it was “hot.” After Gosciminski returned home, he took the ring and went out toward the beach. Thomas has not seen the ring since that day.
Gosciminski was arrested on October 3, 2002, and indicted for the crimes on October 22, 2002. A few weeks later, Deborah Pelletier’s father found a bag of jewelry in the shed behind Pelletier’s house on Import Drive. The jewelry, which was found inside a Geoffrey Beene cologne pouch, included two sets of earrings, a ring, and a diamond and emerald tennis bracelet. The jewelry was identified as the jewelry owned by Loughman and missing from her body after she was murdered. Pelletier testified that in the beginning of August Gosciminski had come over to her Import Drive house several times a week in order to discuss the affair between Debra Thom *690 as and Ben Thomas. Gosciminski also went to Pelletier’s house sometime in August when Pelletier’s water was not working. Gosciminski had accompanied Pelletier to fix something near the shed where the jewelry was later found. Pelletier also testified that on one occasion after October 2, 2002, but before the jewelry was found, Ben Thomas came over to the house with a group of friends to remove his belongings from the house and garage. Pelletier had visited Gosciminski in jail. When Pelletier told him about the jewelry found in her shed, Gosciminski said “it’s over, I’m done” and told Pelletier not to visit him again.
At trial, the State called numerous witnesses, including detectives who had examined the crime scene and who were involved in the investigation, and Lough-man’s family members who knew about the jewelry she wore and who had talked to her while she was in Florida. The State also called witnesses who had seen the ring that Gosciminski gave Debra Thomas on the evening of September 24, 2002, and who had identified the ring they saw in a lineup.[3] The detectives who were involved with the investigation testified that they took fingerprints from the Vala residence as well as both of Gosciminski’s residences[4] and his truck, but did not find any matching fingerprints or any other scientific or forensic evidence to link Gosciminski to the crime.
Debra Thomas testified that on the morning of September 24, 2002, Goscimin-ski left their home sometime between 7 and 8 a.m. and came back home around lunch time. She testified that she was not sure exactly what time Gosciminski came home because she was not aware that he had returned home as he did not enter through the front door. She stated that it could have been between 11 a.m. and 1 p.m. Thomas first noticed Gosciminski was home when she saw him in the master bathroom. She saw Gosciminski washing up at the bathroom sink and noticed that he had blood on the right side of his arm. She also saw a pile of Gosciminski’s clothes on the floor that were soiled with blood. When Thomas questioned Gosciminski about the bloody clothes, he explained that he had gone to collect some money for a friend in West Palm Beach and had to “rough some guy up.” On cross-examination, defense counsel asked Thomas about her deposition statements regarding the time Gosciminski came home. In her deposition, Thomas had stated that Gosci-minski came home around 1 p.m. and left at 3 p.m. Thomas responded that defense counsel had badgered her into stating this time frame at the deposition and that she was not sure about the exact time of Gosci-minski’s arrival, but it was around lunchtime. Thomas also testified that Goscimin-ski gave her an engagement ring on the evening of September 24, 2002. She described the ring as a large diamond with baguettes on each side set in a white gold or platinum band. She described the condition of the ring as being rather dull, as if it needed to be cleaned.
Nextel engineer Juan Portillo testified at the trial about Gosciminski’s cell phone activity and created a cell phone tower diagram, which indicated the area in which Gosciminski was located during his phone calls on the morning of September 24, 2002. Gosciminski’s cell phone records indicated that he had cell phone activity between 6:31 a.m. and 8:25 a.m. His last *691 call at 8:25 a.m. was an inbound call that lasted twelve minutes, eleven seconds. There was no activity on his phone from 8:37 a.m. until 9:12 a.m. According to the cell tower diagram and which cell tower the call hit, Gosciminski received a call at 9:12 a.m. while he was located in an area close to the Vala residence where Lough-man was murdered. Two other phone calls, one at 9:27 a.m. when Gosciminski accessed his voicemail and one at 9:28 a.m. when he made an outbound call, also hit the cell tower close to the Vala residence. The next phone call at 10:23 a.m. hit a cell tower close to the Harbor Federal Bank in Palm City. The evidence also showed that on the morning of the murder Gosciminski made a cash deposit of $430 at this particular bank at 10:08 a.m. The next phone call at 10:36 a.m. hit a cell tower in the vicinity of where Loughman’s fanny pack was later found.[5] Evidence also showed that a fifty-seven dollar check made out to Goseimin-ski’s mother was deposited by Gosciminski at 11:04 a.m. at another Harbor Federal Bank located at Darwin Square. The last two phone calls at 11:29 a.m. and 11:39 a.m. hit cell towers in the vicinity of where Gosciminski lived.
Associate medical examiner Dr. Linda Rush O’Neill testified in the place of Dr. Charles Diggs, the medical examiner who had conducted the autopsy and testified at the first trial.[6] In preparation for her testimony, Dr. O’Neill reviewed the medical examiner’s file, which included the autopsy report, diagrams, and notes, the testimony and deposition of Dr. Diggs, the crime scene photographs, and the autopsy photographs. According to Dr. O’Neill’s medical testimony, Loughman suffered three different types of injuries: blunt force trauma bruising and lacerations, incise or stab wounds, and abrasions or scraping. The fatal injury was a cut to Loughman’s throat with a knife or knife-like object that severed the left jugular vein and caused her to bleed out. Lough-man was first attacked in the hallway, as indicated by blood in the hallway and her eyeglasses that were apparently knocked from her face. She was then dragged into a bedroom by her feet, where she was severely bludgeoned with an ashtray stand statue, stabbed (possibly with sharp pieces of the glass ashtray statue based on a piece of glass that was removed from the back wound during the autopsy), and cut in the throat. Loughman also suffered lacerations and bruising to her face and head, fractures to the bones of her face, including her jaw from which four teeth were dislodged by the root. The dislodged teeth indicated that significant force was used in the blunt trauma to the head. Loughman also had stab wounds on the back of her neck, her right back torso, and her left chest. The stab wound to Lough-man’s back torso perforated the right lung. At some point in the attack, Loughman suffered a defensive wound to her left hand, indicating that she was conscious during some of the attack. The variety of wounds and their placement on both the front and back of Loughman’s body also indicated that she was conscious and struggling with her attacker. The bludgeoning injuries were consistent with someone using the ashtray statue that was found at the scene as a weapon. The *692 stabbing or sharp force wounds could have been inflicted with a knife or one of the broken pieces of glass from the statue. The stabbing wounds were “somewhat irregular” and not like the margins that would occur with a stab wound from an ice pick or knife. Dr. O’Neill opined that the defensive wound on Loughman’s left hand was caused by a portion of the broken statue. The body temperature of the victim, the rigor mortis, and the livor mortis were consistent with Loughman being killed between 8:47 a.m. and 10:30 a.m. on September 24. Based on the scene and the injuries to the victim, Loughman’s attacker would have blood on his clothing and body.
By an interrogatory response on the verdict, the jury found beyond a reasonable doubt that the murder was both premeditated murder and felony murder. After a two-day penalty phase, the jury recommended a death sentence by a vote of nine to three. Both the State and Gos-ciminski were permitted to present additional evidence as to the appropriate sentence at a Spencer[7] hearing. Gosciminski also presented a written statement to the court.
The trial court followed the jury’s recommendation and imposed a death sentence. The trial court found three aggravating factors were applicable: the murder was cold, calculated and premeditated (CCP) (given great weight); the murder was heinous, atrocious, or cruel (HAC) (given great weight); and the murder was committed during the commission of a robbery or burglary (given great weight), which was merged with the committed for pecuniary gain aggravator. The trial court found one statutory mitigating circumstance: Gosciminski had no significant history of criminal activity (given some weight). The trial court found thirteen nonstatutory mitigating circumstances[8] which were given little to moderate weight. The trial court determined that the mitigating factors did not outweigh the aggravating circumstances and sentenced Gosciminski to death on the count of first-degree murder and to life in prison for burglary and robbery.
ISSUES AND ANALYSIS
On appeal, Gosciminski raises eighteen claims of error.[9] The State also raises a *693 claim regarding the proportionality of the death sentence in this case. We conclude that Gosciminski’s claims are without merit, with the exception of Issue 2 regarding the scope of cross-examination. However, as discussed below, we conclude that this error was harmless beyond a reasonable doubt. We also conclude that the death sentence is proportionally warranted in this case. We address each claim in turn below.
I. Testimonial and Evidentiary Rulings
A number of the issues raised by Gosciminski regard testimonial and eviden-tiary rulings by the trial court. Issues 1, 3, 7, and 10 through 14 involve evidence that Gosciminski contends was improperly admitted. An appellate court will not disturb a trial court’s determination that evidence is relevant and admissible absent an abuse of discretion. See Victorino v. State, 23 So.3d 87, 98 (Fla.2009). Relevant evidence is generally admissible unless precluded by a specific rule of exclusion. Id. (citing § 90.402, Fla. Stat. (2004)).
1. Evidence of “Bad Conduct”
In Issue 1, Gosciminski asserts that it was improper to allow Debra Thomas to testify that she moved back with him in August 2002 because he threatened to harm her, her family, and Ben Thomas. The defense objected to this questioning, noting that there had been no Williams[10] rule notice and arguing the information was irrelevant to the charges against Gos-ciminski. The trial court overruled the defense objection, finding that this evidence was intricately intertwined with the sequence of events that preceded the murder and explained the motive for the murder. The trial court also stated that the lack of Williams rule notice was not of consequence, that the threats would not be made a feature of the trial, and the parties should move on. Because Thomas’s answer had been interrupted by the defense objection, the State asked her again why she had moved back in with Gosciminski and she responded, “Because I didn’t want anyone to get hurt after he threatened me and my family and Ben.” The State then moved on to other questions about the sequence of events that preceded the murder.
There are two categories under which evidence of uncharged crimes or bad acts will be admissible — similar fact evidence, otherwise known as Williams rule evidence, and dissimilar fact evidence. *694 Victorino v. State, 23 So.3d 87, 98 (Fla.2009) (citing Zack v. State, 753 So.2d 9, 16 (Fla.2000)). The requirements and limitations of section 90.404, Florida Statutes (2009), govern similar fact evidence while the general rule of relevancy set forth in section 90.402 governs dissimilar fact evidence. Id. at 98-99. This Court has explained the test for dissimilar fact evidence as follows:
[EJvidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because “it is a relevant and inseparable part of the act which is in issue.... [I]t is necessary to admit the evidence to adequately describe the deed.”
Griffin v. State, 639 So.2d 966, 968 (Fla.1994) (quoting Charles W. Ehrhardt, Florida Evidence, § 404.17 (1993 ed.)).
Dissimilar fact evidence of uncharged misconduct — which is governed by section 90.402’s general rule of relevancy— is admissible to “establish ] the relevant context in which the [charged] criminal acts occurred.” Caruso v. State, 645 So.2d 389, 394 (Fla.1994). “[T]o prove its case, the State is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged.” Griffin, 639 So.2d at 970. Accordingly, evidence of uncharged misconduct is relevant when its admission is “necessary to adequately describe the events leading up to” the commission of the charged offense. Id.
The evidence at issue here explained Gosciminski’s decision to kill Loughman for her jewelry and showed the sequence of events leading up to the murder. See McGirth v. State, 48 So.3d 777, 786-87 (Fla.2010), cert. denied, _ U.S. _, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011) (finding evidence about the defendant’s drug-based relationship with the victims’ daughter was relevant and inextricably intertwined with the crimes charged). Through Thomas’s testimony at the instant trial and Gosci-minski’s videotaped testimony from the 2005 trial,[11] the jury learned that the pair had an on-again off-again relationship for at least six months preceding the murder. Thomas moved out of Gosciminski’s home in April 2002, June 2002, and August 2002, but returned each time. Through this testimony and the testimony of other witnesses, the jury also learned that Debra Thomas and Ben Thomas met sometime in the spring of 2002 and lived together for about one month in July and August. Gosciminski was aware of this relationship between Debra and Ben and visited Ben’s wife Deborah Pelletier regularly for several weeks in August 2002 to get more information about Ben, discuss the relationship between Ben and Debra, tell Pelletier what he knew about the activities of Ben and Debra, and talk about his efforts to get Debra to move back with him. Debra Thomas also testified that when she moved away from Gosciminski, he sent her flowers and gifts of jewelry to convince her to move back with him. Thomas also stated that Gosciminski made false statements and created false documents to convince her that he was very wealthy. Goscimin-ski was aware of Debra’s relationship with Ben Thomas and was competing with Ben to get Debra back. Gosciminski made statements to many individuals, including Debra Thomas, that he was going to get Debra a two-carat diamond engagement ring. The threat testimony was part of *695 the progression of Gosciminski’s plan to get Debra back. He started with flowers and small gifts of jewelry, progressed to getting her a new car and a home on the beach, made promises of a two-carat diamond engagement ring, and then made threats. All of this behavior explains Gos-ciminski’s motive for the murder. See Victorino, 23 So.3d at 100 (finding evidence of fight and shooting at a park was properly admitted as dissimilar fact evidence because it presented a complete picture of the defendant’s successive and violent attempts to get his property back which culminated in the murders of six individuals). Moreover, the threat testimony did not become a feature of Gosciminski’s trial.
Thus, we reject Gosciminski’s claim that the threat evidence constitutes Williams rule evidence subject to the requirements of section 90.404(2). We also conclude that the trial court did not abuse its discretion in admitting Debra Thomas’s testimony as relevant evidence pursuant to section 90.402 in order to establish the context in which the charged criminal acts occurred.
Gosciminski also contends that it was error to allow Debra Thomas to testify that he intercepted her mail, thereby causing her not to obtain her nursing license in Arizona (Issue 3). Gosciminski argues that he was prejudiced by this evidence of bad character and an uncharged crime.
In discussing her relationship with Gos-ciminski, Thomas testified that after moving back with Gosciminski she took a trip to Arizona to apply for a nursing license with the intent of moving there permanently. Thomas gave Gosciminski’s address to the licensing board, but she never received her license because, according to Thomas, her “mail was intercepted.” When the State asked if Gosciminski was the only person living at the address at the time, the defense objected on the basis that the answer would be speculation and constituted bad character evidence because intercepting United States mail is a federal offense.
The defense also moved for a mistrial. The trial court overruled the speculation objection, finding that it was within Thomas’s knowledge who was living in the house she shared with Gosciminski. Thomas had already testified that only she and Gosci-minski had lived in the house in the preceding five months. As the trial court explained, people generally know who is living in their house even when they go on a trip. The court ruled that the objection to the “intercepting mail” comment was untimely because the defense had not made a contemporaneous objection to that testimony. However, despite the untimeliness of the objection, the court still allowed Gosciminski’s counsel to argue the bad character objection. The court noted that Gosciminski lived at the home and could properly accept any mail that arrived there. When the court inquired if the defense wanted the State to clarify this matter through further questioning of the witness, the defense declined the offer. Finally, the trial court concluded that neither comment required a mistrial.
A trial court’s denial of a motion for mistrial is reviewed by an abuse of discretion standard. Cole v. State, 701 So.2d 845, 852 (Fla.1997). Discretion is abused only “when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.” Huff v. State, 569 So.2d 1247, 1249 (Fla.1990); see also Frances v. State, 970 So.2d 806, 813 (Fla.2007).
The granting of a motion for mistrial is not based on whether the error is “prejudicial.” Rather, the standard requires that a mistrial be granted only *696 “when an error is so prejudicial as to vitiate the entire trial,” England v. State, 940 So.2d 389, 401-02 (Fla.2006), such that a mistrial is “necessary to ensure that the defendant receives a fair trial.” McGirth v. State, 48 So.3d 777, 790 (Fla.2010). “It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity.” England, 940 So.2d at 402 (quoting Thomas v. State, 748 So.2d 970, 980 (Fla.1999)). Therefore, “[i]n order for [Debra’s testimony] to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.” Salazar v. State, 991 So.2d 364, 372 (Fla.2008) (quoting Spencer v. State, 645 So.2d 377, 383 (Fla.1994)). Neither of the comments at issue here rose to that level. Accordingly, we conclude that the trial court did not abuse its discretion in its rulings on the comments or its denial of Gosciminski’s motion for a mistrial.
In Issue 7, Gosciminski argues that the trial court erred in admitting the testimony of Joan Cox that Gosciminski noticed her diamond ring when she met him in June 2001. The State proffered the direct testimony of Cox about an encounter she had with Gosciminski when she was seeking an assisted living facility for her mother. Cox stated that Gosciminski invited her and her granddaughter to have lunch at the facility and during lunch he noticed and made a favorable comment about Cox’s diamond ring. Defense counsel objected that this evidence was irrelevant and was inadmissible Williams rule evidence for which the State had not given the required statutory notice. The trial court ruled that Cox’s testimony was not Williams rule evidence because it involved an “innocuous” remark, not a collateral crime. The court also ruled that the testimony was relevant because “[i]t shows the knowledge of rings, an awareness of rings” and “relates back” to Gosciminski’s statement to the police that he did not notice clients’ jewelry because it was irrelevant to his job. Thus, the trial court admitted Cox’s testimony into evidence.
Section 90.404(2), Florida Statutes (2009), provides that “[similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.” When the state intends to offer similar fact evidence of other criminal offenses, it is required to give notice no fewer than ten days before trial of its intent to rely on Williams rule evidence and provide a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information. § 90.404(2)(c) 1, Fla. Stat. (2009). However, no notice is required for evidence of offenses used for impeachment or on rebuttal. Id.
In his 2002 interview with the police, which was introduced into evidence by the State, Gosciminski stated that he had no clue whether Loughman had a lot of money. When asked if he noticed the numerous diamond and emerald bracelets and other expensive jewelry that Loughman wore all of the time, Gosciminski replied that he “didn’t notice stuff like that” because it was totally irrelevant to his job. Cox’s testimony that Gosciminski did in *697 fact notice jewelry and even commented on her diamond ring was relevant to Gosci-minski’s statement to the contrary. Thus, the trial court did not err in admitting this testimony that was relevant to the case.
2. Cell Phone Tower Evidence
In Issues 10 and 11 Gosciminski contends that the trial court erred and also abused its discretion in allowing testimony and exhibits regarding the area of coverage of cell phone towers in the Fort Pierce area. The State sought to present this evidence to prove that Gosciminski was in certain locations at certain times during the morning of the murder. This proof was based on the phone calls sent and received on Gosciminski’s cell phone and the signals received by particular cell towers.
“The admissibility of evidence is within the sound discretion of the trial court, and the trial court’s determination will not be disturbed on appellate review absent a clear abuse of that discretion.” Brooks v. State, 918 So.2d 181, 188 (Fla.2005). The basic principles of cellular technology have been widely accepted and admitted into evidence. See, e.g., Gordon v. State, 863 So.2d 1215, 1219 (Fla.2003) (stating that testimony about cell phone records and comparing them to locations on cell site maps was not expert testimony and was properly admitted); Perez v. State, 980 So.2d 1126, 1131-32 (Fla. 3d DCA 2008) (ruling that cell phone records, cell site maps, and testimony explaining them was properly admitted and did not constitute expert testimony); Pullin v. State, 272 Ga. 747, 534 S.E.2d 69, 71 (2000) (ruling that expert testimony pinpointing the location from which the defendant’s cellular telephone calls were placed was admissible).
During the State’s case-in-chief, the State introduced the testimony of Nextel engineer Juan Portillo regarding maps of the cell towers, the coverage areas of the towers, propagation information, and specific cell phone calls made or received by Gosciminski. Portillo discussed Goscimin-ski’s cell phone records for September 24, 2002, which were admitted without objection. Portillo explained how he developed the diagrams showing the cell tower locations with their sector coverage and propagation for each sector. Portillo also testified about where Gosciminski’s calls had originated based on the sector that picked up the signal first. When the State sought to introduce the diagrams into evidence, the defense objected that the diagrams were misleading and confusing and were hearsay unless Portillo knew from personal experience where the towers were located.
In a sidebar conference, the trial court noted that the defense had not made a contemporaneous objection to Portillo’s oral testimony about the diagrams and the information contained on them. The court also noted that cell phone records and cell tower site information have been routinely admitted in Florida for over fifteen years and that under Florida case law it was not necessary for an expert to testify about these matters because such information is understood by the average juror who owns a cell phone. The trial court concluded that that the defense objection went to the weight of the evidence and not its admissibility. The court ruled that the diagrams were not misleading or hearsay and allowed them to be admitted.
Later when Portillo was questioned by the State about locations that would hit the sector two of the Faber Cove tower,[12] the *698 defense objected and argued that the conditions had changed since 2002 and the time when Portillo made his pretrial measurements. After the court confirmed that Portillo would be rendering his opinion regarding the coverage and power of the tower in September 2002, the court overruled the defense objection and again ruled that the objection went to the weight of the evidence and not its admissibility.
We agree with the trial court’s rulings that the diagrams and the testimony relating to them were properly admitted. The testimony and diagrams regarding the cell tower coverage were relevant to Gosciminski’s possible location during the time of Loughman’s murder on the morning of September 24, 2002. See Gordon v. State, 863 So.2d 1215, 1219 (Fla.2003) (finding that testimony on the cell phone record and cell site map was useful in assisting the jury to understand the phone records). The defense had an opportunity to cast doubt on the weight of the evidence during its cross-examination of the witness as to the probability and likelihood of the cell tower coverage.
Gosciminski also objected that Portillo did not have sufficient data regarding the cell towers at the time of the crime to render an opinion about the reach of the cell towers or their location. Contrary to this argument, Portillo testified about his experience and training, which included twenty years working as a radio frequency engineer in telecommunications, a degree in electrical engineering and a number of continuing education courses, and being in charge of maintenance and coverage of Nextel cell towers for the southeast region of Florida for the preceding three years. Portillo also testified at length about the technology and science relating to cell phones and towers. Portillo reported the results of his measurements and offered his opinion as to which tower would have picked up Gosciminski’s phone calls in September 2002. The defense was able to thoroughly cross-examine Portillo about factors that could affect the tower signals, thereby calling the jury’s attention to the weight to be afforded Portillo’s opinion testimony. The defense also presented its own telecommunications expert who offered a different opinion as to the coverage of the cell towers.
Thus, we conclude that the trial court did not abuse its discretion in overruling Gosciminski’s objections and allowing into evidence the cell tower diagrams and testimony relating to them.
3. Driving Test Results
In Issue 12, Gosciminski argues that the court erred in allowing testimony about the time it took law enforcement officers to drive to and from certain locations, including the crime scene, the banks where Gosciminski made the deposits on the day in question, and the area where Loughman’s fanny pack was found. Gosci-minski contends this testimony should not have been admitted because the officers did not know the traffic, weather or road conditions on September 24, 2002, and the officers may not have followed the route that Gosciminski took.
Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law. See §§ 90.401, 90.402, Fla. Stat. (2009). Relevant evidence is inadmissible, however, where the probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. See § 90.403, Fla. Stat. (2009). The admissibility of evidence is within the sound discretion of the trial court, and the trial court’s determination will not be disturbed on appellate review absent a clear abuse of that discretion. *699 See Hildwin v. State, 951 So.2d 784 (Fla.2006); Ray v. State, 755 So.2d 604 (Fla.2000). However, even if it is found that the trial court erred and abused its discretion, the error is subject to a harmless error analysis. See Brooks v. State, 918 So.2d 181, 194 (Fla.2005) (citing State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)), receded from on other grounds by State v. Sturdivant, 94 So.3d 434, 436 (Fla.2012).
Gosciminski objected to all of the driving test testimony[13] on the basis of relevance and failure to lay a proper foundation as to the traffic and road conditions on the morning of September 24, 2002. The trial court overruled all of the objections, noting that the time it takes to drive the most direct and logical route between these places was relevant to the question of whether it was within the ability of the defendant to cover this distance within a certain period of time. The court also ruled that the foundation objections went to the weight of the evidence, not its admissibility, and the defense could question the witnesses about these matters on cross-examination.
Gosciminski argues that for the driving test evidence to be admissible, the test had to be conducted under conditions substantially similar to those which prevailed at the time of the incident. See Goodyear Tire & Rubber Co. v. Ross, 660 So.2d 1109, 1111 (Fla. 4th DCA 1995); Dempsey v. Shell Oil Co., 589 So.2d 373, 380 (Fla. 4th DCA 1991). However, these eases cited by Gosciminski involved expert witnesses conducting scientific experiments and providing opinion testimony based on those experiments. In a case involving the same type of driving test evidence, the district court noted that the defense could have explored the perceived weaknesses in such timeline results through voir dire of the witness or on cross-examination. See Pierre v. State, 990 So.2d 565, 570 (Fla. 3d DCA 2008).
In the instant case, the officers were not conducting a scientific experiment and were not testifying as expert witnesses. The officers explained the routes they took, the speed they traveled, and the conditions they encountered. Defense counsel cross-examined them about their knowledge of the road conditions, the weather, and other factors that existed on September 24, 2002, and was able to elicit that the officers had little or no knowledge of those conditions. The routes taken by the officers were based on the route that Gosciminski testified he took on the day of the murder or reasonable routes based on the cell phone records.
The officers’ testimony regarding the time required to drive to and from certain locations was relevant to show that Gosci-minski was capable of completing the crime within the known time-frame. Further, the officers neither testified as expert witnesses nor offered opinion testimony. The officers merely recounted their routes and the time it took them to drive this distance. See Johnson v. State, 442 So.2d 193, 196 (Fla.1983) (explaining that rule of “essential similarity” between test conditions and actual conditions is an issue of the weight to be given to the evidence rather than its relevance or materiality). Moreover, as the trial court noted here, such time and distance figures are facts that are easily ascertainable from sources *700 like MapQuest, which are not reasonably subject to dispute, and the court could actually take judicial notice of such information. Thus, we conclude that the trial court did not abuse its discretion by admitting the testimony regarding the driving times.
4. Documentary and Photographic Evidence
In Issue 18, Gosciminski contends that it was error to admit a Walgreen’s cash receipt produced by Ben Thomas because the receipt was not properly authenticated. The State presented the testimony of Ben Thomas regarding his whereabouts on the morning of the murder in order to rebut Gosciminski’s theory that Ben Thomas had committed the murder. Thomas testified that he ran a number of errands in the Fort Pierce area on the day of the murder and then drove to Miami in order to catch a 4 p.m. flight to Atlanta. Thomas also testified that he did not fly back to Miami until the next day and then conducted several presentations for his employer in Miami on September 26. Thomas drove back to the Fort Pierce area two days after the murder.
The State presented a number of receipts that corroborated Thomas’s account of his activities, including a cash receipt from a Walgreens store on Federal Highway in Fort Pierce, which was dated September 24, 2002, and time-stamped at 9:19 a.m. However, the receipt was missing the register number, cashier number, and the transaction number. The defense argued that this receipt should not be admitted because it had not been authenticated by a Walgreens representative.
Section 90.901, Florida Statutes (2009), requires the authentication or identification of a document prior to its admission into evidence. However, the requirements of section 90.901 “are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” § 90.901, Fla. Stat. (2009); see also State v. Love, 691 So.2d 620, 621 (Fla. 5th DCA 1997). Evidence may be authenticated by examination of its appearance, contents, substance, internal patterns, or other distinctive characteristics in conjunction with the circumstances. Coday v. State, 946 So.2d 988, 1000 (Fla.2006) (finding that trial court did not abuse its discretion in concluding that defendant’s confession was authentic because there was an abundance of evidence to support finding that the signed, written statement was drafted by the defendant). Once a prima facie showing of authenticity is made, the evidence comes in, and the ultimate question of authenticity is for the jury. See Charles W. Ehrhardt, Florida Evidence § 901.1, at 1092-93 (2013 ed.).
Here, the trial court ruled that the Wal-greens receipt was admissible because it was printed on paper with a distinctive green Walgreens logo watermark, the Walgreens’ return policy was printed on the back of the receipt, the front of the receipt showed no evidence of tampering, and the time and date-stamp matched Thomas’s account of when he made the purchase at Walgreens. These distinctive characteristics of the receipt in conjunction with the other circumstances, i.e., the trail of documentary evidence that supported Thomas’s testimony about his activities and whereabouts on the morning of the murder, were adequate authentication. Thus, we conclude that the receipt was properly admitted.
In Issue 14, Gosciminski contends that the trial court erred in admitting two photographs of Loughman wearing the jewelry that was taken during the robbery-murder. While Gosciminski objected to the admission of the photograph depicting Loughman holding a baby and stand *701 ing next to a small child and a young woman, he raised had no objection to the admission of the second photograph that depicted Loughman standing next to a man. Thus, only the admission of the first photograph was preserved for our appellate review.
Trial courts have broad discretion in deciding the admissibility of photographic evidence, and this discretion will not be disturbed absent a clear showing of abuse. See Pangburn v. State, 661 So.2d 1182, 1187 (Fla.1995); Vargas v. State, 751 So.2d 665, 666 (Fla. 3d DCA 2000). A photograph’s admissibility is based on its relevancy, not its necessity. See Pope v. State, 679 So.2d 710, 713 (Fla.1996). If a photograph is relevant to an issue at trial, either independently or to corroborate other evidence, it is admissible unless the probative value is outweighed by undue prejudice. Allen v. State, 662 So.2d 323, 327 (Fla.1995); Straight v. State, 397 So.2d 903, 906 (Fla.1981). Relevancy requires that the photo of the deceased victim be probative of an issue that is in dispute.
The photograph in question was admitted to depict the jewelry that Loughman wore. The photograph corroborated witness testimony that Loughman wore all of her jewelry daily. Further, the photograph was relevant to show what jewelry Gosciminski could have seen when he met Loughman, which was an issue in the case. The jury’s attention was directed solely to the jewelry. The presence of the family members was not mentioned when the photograph was published to the jury, nor was it made a feature of the trial. Thus, we conclude that the trial court did not abuse its discretion in admitting this photograph in to evidence.
II. Admissibility of Polygraph Test Results
In Issue 9, Gosciminski argues that the trial court improperly excluded the results of his polygraph examination, which he claims were exculpatory evidence. Specifically, he contends that the trial court erred in its ruling as to the relevant scientific community and its interpretation of the testimony of the State and defense experts.
Polygraph evidence is generally inadmissible in Florida. See Duest v. State, 12 So.3d 734, 746 (Fla.2009); Walsh v. State, 418 So.2d 1000, 1002 (Fla.1982) (“[P]olygraph evidence is inadmissible in an adversary proceeding in this state.”). However, as scientific discovery changes or advances, Florida courts apply the Frye[14] test in order to determine the reliability of new or novel scientific evidence. See Brim v. State, 695 So.2d 268, 271 (Fla.1997). As the Frye court explained:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).
As we explained in Ramirez v. State, 651 So.2d 1164, 1166-67 (Fla.1995), the admission into evidence of expert opinion testimony concerning a new or novel scientific principle is a four-step process. First, the trial judge must determine *702 whether such expert testimony will assist the jury in understanding the evidence or in determining a fact in issue under section 90.702, Florida Statutes. Id. at 1167.[15] Second, the trial judge must decide whether the expert’s testimony is based on a scientific principle or discovery that is “sufficiently established to have gained general acceptance in the particular field in which it belongs.” Ramirez, 651 So.2d at 1167 (quoting Frye, 293 F. at 1014).[16] Third, the trial judge must determine whether a particular witness is qualified as an expert to present opinion on the subject at issue. Ramirez, 651 So.2d at 1167. Fourth, the judge may allow the expert to render an opinion, and it is then up to the jury to determine the credibility of that opinion. Id.; Wuornos v. State, 644 So.2d 1000, 1010 (Fla.1994) (“[T]he finder of fact is not necessarily required to accept [expert] testimony.”).
The second step, concerning whether to allow expert testimony on a new or novel subject, is especially important to the process. The principal inquiry under the Frye test is whether the scientific theory or discovery from which an expert derives an opinion is reliable. Polygraph evidence has, as a matter of law, long been inadmissible as evidence in Florida. See Kaminski v. State, 63 So.2d 339 (Fla.1952). The last time its admissibility was expressly decided by this Court was in Delap v. State, 440 So.2d 1242, 1247 (Fla.1983), in which we concluded that polygraph testing had not “gained such reliability and scientific recognition in Florida as to warrant its admissibility.” This rule of inadmissibility “reflects state judgment that polygraph evidence is too unreliable or too capable of misinterpretation to be admitted at trial.” Id. However, we did recognize that the parties may waive their evidentiary objection. Id. The use of a polygraph examination as evidence is premised on the waiver by both parties of evidentiary objections as to lack of scientific reliability. Id.
In utilizing the Frye test, the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts at hand. The trial judge has the sole responsibility to determine this question. The general acceptance under the Frye test must be established by a preponderance of the evidence. Ramirez, 651 So.2d at 1168. Just as important as the burden of proof is the fact that the hearing must be conducted in a fair manner. Id. This is especially important in a criminal trial where the defendant is guaranteed certain constitutional rights, not the least of which is the due process right to present witnesses in one’s behalf. Id.
The appropriate standard of review of a Frye issue is de novo. See Hadden v. State, 690 So.2d 573, 579 (Fla.1997). Thus, an appellate court reviews a trial court’s ruling as a matter of law, rather than under an abuse-of-discretion standard. When undertaking such a review, the appellate court should consider the issue of general acceptance at the time *703 of the appeal rather than at the time of trial. Id.; Hayes v. State, 660 So.2d 257, 262-64 (Fla.1995) (finding a Frye test not properly applied in light of a scientific report issued after the trial); Bundy v. State, 471 So.2d 9, 18 (Fla.1985) (finding that in a case in which the trial court failed to conduct a Frye hearing, hypnotically refreshed testimony was not shown to be reliable at the time of appeal). An appellate court may examine expert testimony, scientific and legal writings, and judicial opinions in making its determination. See Flanagan v. State, 625 So.2d 827, 828 (Fla.1998) (finding, after an examination of the relevant academic literature and case law, that sex offender profile evidence was not generally accepted).
Here, the trial court held a Frye hearing and concluded that Gosciminski did not carry his burden of proof and did not show by a preponderance of the evidence that polygraph test results are generally accepted by the relevant scientific community. At the Frye hearing, Gosciminski presented the testimony of Dr. John Pal-matier, a doctor of social sciences who conducts polygraph examinations and also teaches about the science of polygraphs. Dr. Palmatier testified that polygraph examinations have eighty to ninety percent accuracy and that the relevant scientific community for assessing the acceptance of polygraphs is scientists who are engaged in psycho-physiological research. Dr. Pal-matier also testified that he had administered a polygraph examination to Gosci-minski, which indicated Gosciminski’s truthfulness in declaring that he did not murder or harm Joan Loughman.
The State presented the testimony of Dr. Stephen Fienberg, a professor of statistics and computer science at Carnegie Mellon University and the chair of a committee of the National Research Council (NRC) of the National Academy of Sciences.[17] The committee chaired by Dr. Fienberg reviewed the scientific evidence on the polygraph for nineteen months and published a report in 2008 recommending against the use of polygraphs because they are inherently inaccurate. Dr. Fienberg stated that there is considerable consensus in the scientific community[18] that the polygraph is not sufficiently accurate to rely upon for any purpose. Dr. Fienberg also served on another NRC committee in 2008 which concluded that there were no new studies suggesting that measurements from the autonomic nervous system (such as polygraphs) were accurate in detecting deception. Dr. Fienberg also criticized Dr. Palmatier’s methodology in determining the accuracy of polygraphs because it did not include any inconclusive results in the statistics. The parties also submitted six volumes of literature, reports, and other documents relating to polygraphs for the trial court to consider.
Following the hearing, the trial court ruled that polygraph results are not generally accepted in the scientific community and cited at length the 2003 report from the NRC committee and Dr. Fienberg’s testimony. The court noted that the defense expert has a vested interest in the theory and had narrowly defined the relevant scientific community to include those with similar vested interests, i.e., those *704 who accept, acknowledge, and use polygraphs. The trial court also noted other scholarly literature that had reached the same conclusion as the NRC committee, namely that polygraph results are not accurate enough to be used as evidence in courts. The trial court concluded that “polygraph examinations are not accepted within the realm of the scientific community” and the defense had “failed to meet its burden of proof for the admission of the polygraph generally.”
Gosciminski asserts that Dr. Fien-berg’s grouping ranged far beyond the community of scientists active in the field to which the evidence belongs. This argument, however, is not persuasive. Frye requires more than the testimony of an expert who has a personal stake in the theory or is prone to an institutional bias. Ramirez v. State, 810 So.2d 836, 844 n. 13 (Fla.2001). “[GJeneral scientific recognition requires the testimony of impartial experts or scientists. It is this independent and impartial proof of general scientific acceptability that provides the necessary Frye foundation.” Id. at 851. Based on the evidence presented at the Frye hearing and our examination of the relevant scientific evidence, we agree with the trial court’s ruling that the polygraph test results were inadmissible.
III. Limiting Witness Cross-examination
In Issues 2 and 6, Gosciminski argues that the trial court erred in limiting his cross-examination of witnesses Debra Thomas and Maureen Reape. As explained below, we find no error regarding the scope of Reape’s cross-examination. We do find that the trial court erred in limiting Gosciminski’s cross-examination of Debra Thomas, but conclude that this error was harmless beyond a reasonable doubt.
Maureen Reape was a friend of Debra Thomas who testified for the State about the engagement ring that Goscimin-ski gave to Thomas. Prior to Reape’s testimony, defense counsel stated his intention to cross-examine Reape about her incarceration in jail for a driving under the influence (DUI) conviction. However, because this is a misdemeanor offense, it could not be the basis for impeaching Reape. See § 90.610, Fla. Stat. (2009)(providing for impeachment based on a witness’s conviction for a crime punishable by more than one year in prison or a crime that involves dishonesty or a false statement).
The defense also asserted that Reape’s incarceration was relevant to show that she was biased and trying to gain favor with the State for a possible modification of her sentence or the terms of her probation. While bias is a permissible basis for attacking a witness’s credibility under section 90.608(2), Florida Statutes (2009), there must be some foundation for the claim of bias. Here, Reape’s sentence had been imposed more than sixty days earlier and thus her sentence could not be modified. During the defense’s proffered cross-examination, Reape testified that she had never been convicted of a felony or a crime involving dishonesty, that her DUI conviction was a misdemeanor, and that she did not have a sentence of probation. Thus, there was no proper basis for the defense to impeach Reape’s credibility based on her DUI incarceration.
Finally, it is not clear that the defense even preserved this issue for appellate review. During the proffered cross-examination, the court noted that if Reape’s 2009 trial testimony following her DUI convictions was consistent with her 2005 trial testimony which had occurred before she had any DUI convictions, then there would *705 be no bias or motive for the defense to point out. Defense counsel agreed that the proper course was to proceed with Reape’s direct testimony and see if there were any inconsistencies. Defense counsel never called any inconsistencies to the court’s attention and never sought to cross-examine Reape about her incarceration or possible bias for the State. Thus, Gosciminski’s cross-examination of Reape was not improperly limited by the trial court.
However, we agree with Gosci-minski that the trial court erred in prohibiting his cross-examination of Debra Thomas about drug and alcohol use (Issue 2). Gosciminski wanted to confront Thomas about her testimony that she had moved back with Gosciminski because he had threatened her and her family. Gosci-minski asserted that it was not Thomas’s decision to move out of their residence, but rather that he made her move out because she had an ongoing drug and alcohol problem. During the defense’s cross-examination of Thomas, the court conducted a sidebar conference regarding this line of questioning. The State asserted that this matter had been ruled on by the court at Gosciminski’s first trial and the evidence had been found irrelevant. Defense counsel noted that evidence regarding Thomas’s drug and alcohol use had been proffered at Gosciminski’s first trial. The parties stipulated that the same evidence would be proffered at this trial as well.
At the first trial, the defense proffered the following testimony from Gosciminski about his relationship with Debra Thomas. Gosciminski met Thomas in 2000, and they had broken up and reunited a number of times throughout their relationship. The breakups occurred during times when Thomas was drinking alcohol and using drugs that she obtained from her work. Thomas was addicted to both drugs and alcohol and used multiple substances at the same time; her addiction affected her ability to be truthful; and she lost jobs and had licensing problems because of her addictions. The breakups occurred each time Gosciminski learned that Thomas had relapsed into drug and alcohol use and was lying to him about various things. After each breakup, Thomas would call Gosci-minski, promise that she was sober, and ask to move back with him. During questioning by the State, Gosciminski also asserted that Thomas had been using his credit cards without his permission to purchase beer and other items, had lied about her whereabouts to cover up the time she was spending time with Ben Thomas, and had stolen from Gosciminski.
The State objected to the admission of any evidence of drug use by Debra Thomas as irrelevant, improper character evidence, and hearsay. Gosciminski’s defense counsel argued that the proffered evidence would rebut Thomas’s testimony that she only returned to Gosciminski because he had threatened her. Instead, defense counsel argued, Thomas’s return had nothing to do with threats from Gosci-minski, but rather with his tolerance for someone who was an alcohol and drug abuser. Defense counsel also asserted that the proffered evidence would rebut the State’s theory that financial problems were Gosciminski’s motive for committing the robbery. To the contrary, counsel argued, this evidence, showed that it was actually Debra Thomas who was in financial difficulty and who had put Gosciminski into difficulty. The trial court ruled that Gosciminski would be confined to testifying about things he actually saw Debra Thomas do or actions that she had admitted doing. During his testimony at the 2005 trial (which was played to the jury in the instant trial), Gosciminski testified that he personally observed Debra Thomas tak *706 ing various prescription narcotic drugs and that she mixed them with alcohol. He also testified that Thomas’s drug and alcohol use was the source of the problems in their relationship and the reason for their breakups, with Thomas requesting the reunions only to relapse into substance abuse each time. Goseiminski also testified that Thomas made various financial demands of him, including that he purchase her a new car and a diamond ring and that they move to the beach. However, Goseiminski’s counsel was not permitted to question Thomas about this alleged drug and alcohol use on cross-examination.
The Florida Evidence Code provides that “[c]ross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness.” § 90.612(2), Fla. Stat. (2009). The credibility of a witness may be attacked “by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment.” § 90.610(1), Fla. Stat. (2009). The trial judge has wide latitude to impose reasonable limits on such cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); see also Moore v. State, 701 So.2d 545, 549 (Fla.1997). Limitation of cross-examination is subject to an abuse of discretion standard. See Moore, 701 So.2d at 549; Geralds v. State, 674 So.2d 96, 100 (Fla.1996).
The State contends that prohibiting Gos-ciminski from questioning Debra Thomas about drug and alcohol use was proper under this Court’s previous case law. The State specifically cites this Court’s decision in Trease v. State, 768 So.2d 1050 (Fla.2000), which held that evidence of drug use for impeachment should be excluded unless:
(a) it can be shown that the witness had been using drugs at or about the time of the incident which is the subject of the witness’s testimony; (b) it can be shown that the witness is using drugs at or about the time of the testimony itself; or (c) it is expressly shown by other relevant evidence that the prior drug use affects the witness’s ability to observe, remember, and recount.
Id. at 1054 (quoting Edwards v. State, 548 So.2d 656, 658 (Fla.1989)). However, the defense was not trying to impeach Thomas’s credibility with this evidence of drug and alcohol use, but rather to address her direct examination testimony that she went back to Goseiminski in August 2002 because he had threatened her. The State opened the door to this line of questioning in its direct examination by asking Thomas about her motivation for moving back with Goseiminski and thus it fell within the scope of cross-examination permitted by section 90.612(2). As Goseiminski asserted to the trial court, this testimony was relevant to rebut the threat testimony as well as the financial motive for Goseiminski committing the robbery and murder.
Errors in limiting or restricting the scope of cross-examination are subject to harmless error analysis. See Lukehart v. State, 776 So.2d 906, 920 (Fla.2000) (finding restriction on cross-examination of deputy as to whether the police had provided a lawyer for defendant after his request for counsel was harmless beyond a reasonable doubt because the totality of the evidence demonstrated that the statements were voluntarily made and defendant was without counsel at the time he was talking to the police); Kramer v. State, 619 So.2d 274, 276 (Fla.1993) (finding that any error in restricting cross- *707 examination of medical examiner was harmless in light of the entire record).
In the instant case, although defense counsel was not allowed to question Debra Thomas about what role drug and alcohol use played in her breakups with Goscimin-ski, the jury heard this information during the defense’s case-in-chief via Goscimin-ski’s videotaped testimony from the 2005 trial. Gosciminski testified that he personally saw Debra taking narcotic drugs not prescribed to her, that he saw her use alcohol along with the drugs, and that her substance addiction was the reason for their breakups. In light of this record, we conclude that the error in limiting cross-examination on this issue was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
IV. Grand Jury Testimony
In Issue 4, Gosciminski asserts that the trial court erred in denying his motion for disclosure of Debra Thomas’s grand jury testimony. Gosciminski filed a pretrial motion for disclosure of all grand jury testimony. During a pretrial hearing on the motion, defense counsel argued that Thomas’s testimony that she saw Gosci-minski washing up in their home on the day of the murder had changed between her sworn deposition, which was made before the first trial, and her testimony at the first trial. Thus, the defense requested that Thomas’s grand jury testimony be disclosed in order to reveal other inconsistencies in her testimony. At the pretrial hearing, the parties presented the various statements that Thomas had made in regard to this incident and its timeline. After conducting an in camera review of Thomas’s grand jury testimony to compare it with her deposition and trial testimony, the trial court found no evidence of perjury or material inconsistencies that would justify disclosure of secret grand jury proceedings. The court found Thomas’s trial testimony and grand jury testimony to be generally consistent. In denying Gosci-minski’s motion, the trial court noted, “It is clear that the witness, quite simply, does not know the exact time of the defendant’s arrival or departure, but can only reference it to somewhere around lunch time.” During this appeal, Gosciminski filed a motion to supplement the record with the grand jury testimony. We ordered the grand jury testimony to be submitted under seal.
Under section 905.27, Florida Statutes (2009), the disclosure of grand jury testimony is not permitted except under three limited circumstances: (1) to determine whether the grand jury testimony is consistent with the testimony given by the witness before the court; (2) to determine whether the witness is guilty of perjury; or (3) in furtherance of justice. In applying this provision, this Court initially held that “[t]here is no pretrial right to inspect grand jury testimony as an aid in preparing one’s defense and holding an in camera inspection of such testimony is a matter within the trial court’s discretion.” Jent v. State, 408 So.2d 1024, 1027 (Fla.1981). In order to obtain access to such testimony, “a proper predicate must be laid. Mere surmise or speculation regarding possible inconsistencies in testimony is not a proper predicate.” Id. at 1027. We later explained this standard in Keen v. State, 639 So.2d 597, 600 (Fla.1994), when we ruled that “a party must show a particularized need sufficient to justify the revelation of the generally secret grand jury proceedings.” We also reiterated that it is within the discretion of the trial court to conduct an in camera inspection of the grand jury testimony. Id.
In this case, Gosciminski made a narrow and specific request regarding Debra Thomas’s grand jury testimony. The trial court responded to that request by con *708 ducting an in camera review of the testimony and concluding that the testimony did not meet any of the reasons for which grand jury testimony can be disclosed, i.e., it was not inconsistent with Thomas’s trial testimony, there was no evidence of perjury, and it was not required in the furtherance of justice. Moreover, defense counsel was able to cross-examine Debra Thomas with her statements to the police, her deposition, and her prior trial testimony to show alleged inconsistencies or uncertainty as to when Gosciminski returned home on the day of murder. This obviated any need to resort to the grand jury testimony. See Brookings v. State, 495 So.2d 135, 138 (Fla.1986) (finding allegations of inconsistencies in various statements of state witnesses were insufficient to require disclosure of witnesses’ grand jury testimony where defense was able during cross-examination to direct jury’s attention to any purported inconsistencies between the witnesses’ trial testimony and prior depositions).
In her original statement to the police, Thomas stated that Gosciminski came home at around 1 p.m. on September 24, 2002. A few days later, she told the police that it was “early afternoon.” In her deposition, Thomas stated that Gosciminski came home “around one o’clock.” At the first trial, Thomas testified that she didn’t know exactly when Gosciminski came into the house, but it was in the vicinity of lunchtime and between 11 a.m. and 1 p.m. Review of Thomas’s sealed grand jury testimony shows that there was no material inconsistency in her testimony. Thus, we affirm the trial court’s ruling on this issue.
V. Circumstantial Evidence Instruction
Gosciminski makes two arguments in Issue 5 regarding his request that the trial court give the previous standard jury instruction on circumstantial evidence.[19] He contends that the trial court abused its discretion in refusing to give the instruction he requested and the court erred in overruling his objection to the State’s closing argument regarding circumstantial evidence. During the charge conference, the trial court stated that it was exercising its discretion not to give the requested instruction because it was fairly embraced within the definition of reasonable doubt. When defense counsel stated his intent to use a poster containing the instruction as a demonstrative aid during closing argument, the trial court responded that counsel could use the instruction as argument, but could not tell the jury that this was the law in Florida. During closing argument, defense counsel discussed circumstantial evidence and essentially tracked the language of the previous standard instruction. However, defense counsel also told the jury that “this is the standard you must apply,” “you are required” to follow this standard, and “you must accept the construction [of the evidence] indicating innocence.” In its rebuttal closing argument, *709 the State responded that the defendant’s argument and poster relating to circumstantial evidence was not the law, even though defense counsel referred to it as the law, and that the judge was not going to give this instruction to the jury. When Gosciminski objected to the State’s closing argument, the trial court overruled the objection, finding that the defendant had invited the State’s response by presenting his closing argument in the format of a jury instruction and asserting that this was the law. The State was permitted to explain that this was an argument the defense could make, but that it was not the law and the judge was not going to instruct the jury on it.
There is no merit to either of Goscimin-ski’s claims relating to the circumstantial evidence instruction. The trial court gave proper instructions on reasonable doubt and the burden of proof, and, thus, did not abuse its discretion in refusing to give the requested instruction on circumstantial evidence. The trial court specifically warned defense counsel that he could not refer to his circumstantial evidence argument as the law. However, defense counsel persisted in stating that this was the law and that the jury was required to follow the circumstantial evidence instruction that he presented. Thus, it was not error to permit the State to correctly inform the jury that this was not the law and they would not receive such an instruction from the court. The jury was properly instructed on the standard of proof and the definition of reasonable doubt and that only the judge’s instructions were the law it was to follow. There was no error in this regard.
VI. Motion for Judgment of Acquittal
In Issue 8, Gosciminski argues that the trial court erred in denying his motion for judgment of acquittal (JOA). At the close of the State’s case, Goscimin-ski’s trial counsel moved for JOA, arguing that the circumstantial evidence presented failed to prove that Gosciminski was the perpetrator of this crime. In denying the motion for JOA, the trial court noted “the seamless web of circumstantial evidence” presented by the State and cited the long list of circumstantial evidence regarding the crime. The trial court concluded that “the cumulative effect of this circumstantial evidence is more than sufficient to sustain a conviction.”
In reviewing a ruling on a motion for judgment of acquittal, a de novo standard of review applies. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. See Donaldson v. State, 722 So.2d 177, 182 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. Pagan, 830 So.2d at 803.
However, where a conviction is based wholly on circumstantial evidence,[20] a special standard of review of the sufficiency of the evidence applies. Jaramillo v. State, 417 So.2d 257, 257 (Fla.1982). Not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant’s reasonable hypothesis of inno *710 cence. See Jackson v. State, 25 So.3d 518, 531 (Fla.2009); Orme v. State, 677 So.2d 258, 262 (Fla.1996). “[I]n such cases, the test to be applied on motion for judgment of acquittal and on review of the denial of such a motion is not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt, but rather whether the jury must reasonably so conclude.” Hernandez v. State, 305 So.2d 211, 211 (Fla. 3d DCA 1974); see also Jones v. State, 466 So.2d 301, 302 n. 2 (Fla. 3d DCA 1985), approved, 485 So.2d 1283 (Fla.1986).
We explained how the circumstantial evidence standard applies to a motion for a judgment of acquittal in State v. Law, 559 So.2d 187 (Fla.1989):
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
... A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch [v. State, 293 So.2d 44, 45 (Fla.1974)], if the state does not offer evidence which is inconsistent with the defendant’s hypothesis, “the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law.” [M] The state’s evidence would be as a matter of law “insufficient to warrant a conviction.” Fla. R.Crim. P. 3.380.
It is the trial judge’s proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to “rebut conclusively every possible variation” of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events. Once that threshold burden is met, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Id. at 188-89 (footnote omitted) (citations omitted).
This Court’s review is limited to ensuring that the State presented competent, substantial evidence that is consistent with defendant’s guilt and inconsistent with any reasonable hypothesis of innocence. Jackson, 25 So.3d at 532. We conclude that the State did so in this case.
The State presented evidence showing that Goseiminski was the last person to see Loughman on the night before she was murdered. Goseiminski stated his intent to get his girlfriend a two-carat diamond ring, like the ring that was stolen from Loughman when she was murdered. He had been to the Vala residence at an earlier date, was familiar with the layout of the house, and knew that Loughman was staying in the house by herself. On the morning of the murder, Goseiminski did not go to work even though he was scheduled to attend a meeting with one of the facility’s directors. Instead, Goseiminski called the director and stated that he was going to be *711 conducting a presentation at another facility that morning. However, when later questioned by the police about his whereabouts that morning, Gosciminski stated that he was home packing boxes. In his 2005 trial testimony, which was played to the jury in 2009, Gosciminski stated that he had made a presentation at another facility and then made numerous stops to deliver brochures and displays to various businesses. Debra Thomas testified that she observed Gosciminski in the bathroom of their home at “lunchtime” on that day washing blood off his arm. Thomas also observed a pile of bloody clothing on the bathroom floor. Gosciminski showed up at work after lunch freshly scrubbed with his hair wet and slicked back. He showed two co-workers a diamond ring that he intended to give Debra Thomas. The ring was not in a box, but wrapped in a tissue or napkin in his pocket. Gosciminski actually gave Thomas the ring that evening and a number of witnesses, including Thomas, described the ring as a two-carat round diamond in a platinum or white gold band with rectangular diamond baguettes on each side. Several witnesses who saw the ring were able to identify a replica of Loughman’s ring from a lineup as matching the ring Gosciminski gave to Thomas. After talking to the police, Gosciminski called Thomas and stated that the ring was hot. Upon arriving home, Gosciminski took the ring out to the beach and it was never seen again. The victim’s fanny pack, containing her credit cards and checkbook, was found along 1-95 at a location where cell phone records showed that Gosciminski had made a phone call that morning. Gosciminski also made a cash deposit at a location close to where the fanny pack was found and at a time consistent with his cell phone records. The cell phone records also showed that Goscimin-ski’s phone hit a cell phone tower in the area of the murder three times during the time frame when the victim was murdered. The victim’s other jewelry was found in a shed at a home that Gosciminski visited regularly for several weeks and which Gos-ciminski had access to. The jewelry found in the shed was inside a Geoffrey Bean cologne bag. Debra Thomas testified she had bought this cologne for Gosciminski and that the bag had been in his dresser drawer until the murder.
The evidence presented was also legally sufficient to contradict Goscimin-ski’s hypothesis of innocence. Goscimin-ski’s theory of defense was that he did not kill the victim and someone else was the murderer. The defense pointed a finger at Ben Thomas. However, Ben Thomas testified as a State "witness about his activities on the day of the murder. Ben Thomas’s account of that day was supported by receipts and other records. Additionally, Gosciminski’s assertion that he was in downtown Fort Pierce distributing brochures at a boutique when his cell phone activated the cell tower closest to the murder scene was rebutted by another State witness. The owner of the boutique testified that she did not allow such displays in her shop and that she did not open the shop until 10 a.m. Gosciminski’s three phone calls hit that cell tower at 9:12 a.m., 9:27 a.m., and 9:28 a.m. The State also presented evidence that if Gosciminski had been in downtown Fort Pierce as he claimed, he had passed up a branch office of his bank in favor of two other branches well away from his work. This evidence was legally sufficient to support the trial court’s denial of the motion for judgment of acquittal. Thus, we find no error as to this issue.
VIL CCP Aggravating Circumstance
Issues 15 and 16 both relate to the application of the cold, calculated, and premeditated (CCP) aggravating circum *712 stance in this case. Gosciminski argues that the trial court erred in finding the CCP aggravator. In reviewing the finding of an aggravating circumstance,
it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, [this Court’s] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted); see also Occhicone v. State, 570 So.2d 902, 905 (Fla.1990) (“When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court,...”). Thus, the scope of our review is limited “to ensuring that the trial court applied the correct rule of law, and if so, that there is competent, substantial evidence to support its findings” as to an aggravating factor. Caballero v. State, 851 So.2d 655, 661 (Fla.2003) (citing Willacy, 696 So.2d at 695).
A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances. See Hudson v. State, 992 So.2d 96, 116 (Fla.2008); Lynch v. State, 841 So.2d 362, 372 (Fla.2003). For CCP to be found, the killing must be
the product of a cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Franklin v. State, 965 So.2d 79, 98 (Fla.2007). The trial court applied this four-part rule of law in conducting its analysis in this case. Thus, the only question here is whether the trial court’s conclusion that the murder was CCP is supported by competent, substantial evidence in the record. See Franklin, 965 So.2d at 98. Simply proving a premeditated murder for purposes of guilt is not enough to support CCP; greater deliberation and reflection is required. Walls v. State, 641 So.2d 381, 388 (Fla.1994).
As stated above, the CCP ag-gravator applies when the evidence supports each of the four elements described in Lynch. First, the murder must have been “cold.” This element has been found wanting “only for ‘heated’ murders of passion, in which the loss of emotional control is evident from the facts.” Walls, 641 So.2d at 387-88. Second, “[t]he calculated element applies in cases where the defendant arms himself in advance, kills execution-style, plans his actions, and has time to coldly and calmly decide to kill.” Wright v. State, 19 So.3d 277, 299 (Fla.2009). A plan to kill may be demonstrated by the defendant’s actions and the circumstances surrounding the murder even when there is evidence that the final decision to kill was not made until shortly before the murder itself. Durocher v. State, 596 So.2d 997, 1001 (Fla.1992). Third, heightened premeditation can be established by examining the circumstances of the killing and the conduct of the accused. The CCP aggravator can be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course. Franklin, 965 So.2d at 98. Taking a victim to an isolated location or choosing an isolated location to carry out an attack can also be indicative of a *713 plan or prearranged design to kill. See, e.g., Thompson v. State, 648 So.2d 692, 696 (Fla.1994). Lack of resistance or provocation by the victim can indicate both a cold plan to kill as well as negate any pretense of justification. Id. (noting that there was no indication that one of the victims resisted the defendant); Eutzy v. State, 458 So.2d 755, 757 (Fla.1984) (noting no evidence of a struggle). The manner in which a murder is carried out can also indicate a cold and calm plan. See, e.g., Eutzy, 458 So.2d at 757 (shooting the victim once in the head execution-style). Finally, the murder must have been committed without any pretense of moral or legal justification. Lynch, 841 So.2d at 371. “[A] pretense of moral or legal justification is any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.” Walls, 641 So.2d at 388.
The sentencing order in the instant case cites the following facts as supporting the CCP aggravator. Gosciminski wanted to obtain a ring for his girlfriend who had recently moved back with him after having an affair with another man; he noticed all of Loughman’s expensive jewelry, especially her two-carat diamond ring, and commented to Loughman that he wanted to get his girlfriend a two-carat diamond ring. About two weeks prior to the murder, Gosciminski went to the Vala residence to help Loughman move her father’s belongings and furniture to Lyford Cove, which gave Gosciminski the opportunity to learn that Loughman was staying at the house by herself and to see where the house was located and the layout of the residence. On the night before the murder, Loughman arranged to meet Gosci-minski at Lyford Cove to pick up her father’s belongings as he was being moved to a hospice facility. Thus, Gosciminski knew that the opportunity to see Lough-man in the future was rapidly coming to an end. On the morning of the murder, Gos-ciminski phoned Lyford Cove to excuse himself from a scheduled 8:00 a.m. staff meeting and stated that instead he would be making a presentation at another facility. At 10:08 a.m., Gosciminski made a cash deposit at Palm City Harbor Federal Bank. Gosciminski arrived at Lyford Cove shortly after lunch that day, appearing freshly scrubbed and showered. Upon his arrival, Gosciminski showed two co-workers a two-carat diamond ring that he intended to give to Debra Thomas. All of Loughman’s jewelry was removed from her body, as well as her fanny pack containing her wallet, checkbook, and credit cards. Cell phone records show no phone activity on Gosciminski’s phone between 8:37 a.m. and 9:12 a.m. on the morning of the murder. At 8:47 a.m., Loughman told her sister that she had to get off the phone because someone was at the door.
The sentencing order also noted the medical testimony related to Loughman’s murder. The attack commenced near the front entrance as soon as the attackér entered the house, based on the blood and other evidence found in the hallway. Loughman was then dragged into a bedroom where she was out of view of the front window. In the bedroom, Loughman was severely bludgeoned -with an ashtray stand and stabbed in the back. She either turned over or was turned over by her attacker because she was also stabbed and cut on the face and neck. Her throat was cut by a knife or knife-like object, severing her jugular vein and causing her death. Loughman had a defensive wound on her left hand that matched a broken portion of the ashtray stand, indicating that she had already been stuck at least once because the stand had to have been broken by the force of a blow prior to the time the defen *714 sive wound was made. Based on this evidence, the trial court found that Goscimin-ski armed himself with a knife or knife-like object either before he went to the residence or after he arrived at the residence. The investigation by law enforcement revealed no evidence of forced entry into the residence and no evidence to suggest that the murder was prompted by emotional frenzy, panic, or a fit of rage.
These facts are sufficient to support the CCP aggravator as it evinces a prearranged design to commit the murder and also exhibits heightened premeditation. Accordingly, we find no error in the trial court’s conclusion that the CCP aggravating circumstance is applicable to this case.
VIII. HAC Aggravating Circumstance
In Issue 17, Gosciminski argues that the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance (HAC). As noted in the discussion of CCP above, in reviewing the finding of an aggravating circumstance, “it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job. Rather, [this Court’s] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Willacy v. State, 696 So.2d 693, 695-96 (Fla.1997) (footnote omitted).
The meaning of the HAC aggravating circumstance terms are “a matter of common knowledge” and are interpreted as follows: “heinous means extremely wicked or shockingly evil; ... atrocious means outrageously wicked and vile; and, ... cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.” State v. Dixon, 283 So.2d 1, 9 (Fla.1973). The HAC aggra-vator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death. Barnhill v. State, 834 So.2d 836, 850 (Fla.2002). In determining whether the HAC aggravator is present, the focus is upon the victim’s perceptions of the circumstances as opposed to those of the perpetrator. Lynch, 841 So.2d at 369. To support this aggravator, the evidence must demonstrate that the victim was conscious and aware of impending death. Douglas v. State, 878 So.2d 1246, 1261 (Fla.2004). Stated otherwise, the HAC aggravator is proper “only in torturous murders — those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.” Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998). The crime must be “conscienceless or pitiless and unnecessarily torturous to the victim.” Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992).
The trial court applied the correct rule of law in determining that HAC applied. Thus, the only question for this Court is whether there is sufficient competent evidence in the record from which the judge and jury could properly find the presence of HAC.
The sentencing order cited a number of facts as supporting the HAC aggravator, including the manner of the attack and the nature of the victim’s wounds. The attack commenced shortly after Loughman let Gosciminski into the residence. Due to her physical limitations, there was little Loughman could do to resist the attack. She was struck so hard that her eyeglasses flew across the room. The autopsy revealed three types of wounds to Lough-man: (1) blunt impact injuries to the head; (2) cutting wounds to the neck and face; *715 and (3) stab wounds to the neck, back, and chest. The lethal wound was a cutting wound over the neck that severed the jugular vein and caused Loughman to bleed to death. Other wounds included three stab wounds — in the mid-back between her shoulder blades, to the right of her spine which perforated the right lung, and in her left chest which perforated a rib. She also had a large laceration on the back of her left hand, which was a defensive wound. The cutting wounds and stabbing wounds were both caused by a knife or knife-like object. During the bludgeoning in the bedroom, two of Loughman’s teeth were knocked out of her head and two others were uprooted and lodged in the back of her mouth, indicating the intensity of the attack. Broken pieces of a metal ashtray stand found around Loughman’s head in the bedroom were consistent with the blunt head trauma. The variety of wounds and their placement on both the front and back of Loughman’s body indicated that she was conscious and struggling during at least part of the attack. All of these facts are supported by sufficient competent evidence presented through the medical testimony.
We have consistently affirmed the HAC aggravator where the victim was repeatedly stabbed and remained conscious during part of the attack. Boyd v. State, 910 So.2d 167, 191 (Fla.2005). When a victim sustains defensive wounds during an attack, it indicates that the victim did not die instantaneously, and in such a circumstance, the trial court can properly find the HAC aggravator. See Rolling v. State, 695 So.2d 278 (Fla.1997); see also Reynolds v. State, 934 So.2d 1128, 1155 (Fla.2006) (upholding trial court’s finding of the HAC aggravator where the testimony by the medical examiner established that the victims exhibited defensive wounds, indicating that they were conscious during some part of the attack and attempting to ward off their attacker). While the exact order of Loughman’s wounds could not be established (except that the neck wound was the fatal wound), there was competent, substantial evidence to support the trial court’s finding that Loughman was alive and conscious for some of the attack and struggled with her attacker. See Boyd, 910 So.2d at 191.
Thus, we conclude that the trial court did not err in finding the HAC aggravating circumstance.
IX. Constitutionality of Florida’s Death Penalty Statute
In Issue 18, Gosciminski seeks relief pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), where the United States Supreme Court held the Arizona capital sentencing statute unconstitutional “to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary.for imposition of the death penalty.” Id. at 609, 122 S.Ct. 2428. This Court has consistently rejected constitutional challenges to Florida’s capital sentencing statute under Ring. See Bottoson v. Moore, 833 So.2d 693 (Fla.2002); King v. Moore, 831 So.2d 143 (Fla.2002). Moreover, “the United States Supreme Court repeatedly has reviewed and upheld Florida’s capital sentencing statute over the past quarter of a century.” Bottoson, 833 So.2d at 695 (citing Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)).
Gosciminski does not present any new arguments in challenging the constitutionality of Florida’s death-penalty statute. Significantly, this Court has rejected similar Ring challenges where the trial court has found as an aggravating circumstance *716 that the crime was committed in the course of a felony or that the defendant has a prior violent felony conviction as both of these aggravators involve facts that were already submitted to a jury and thus are in compliance with Ring. See McGirth v. State, 48 So.3d 777, 795 (Fla.2010) (citing Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004)); Hudson v. State, 992 So.2d 96, 117-18 (Fla.2008). By a unanimous verdict, the jury found Gosci-minski guilty beyond a reasonable doubt of robbing Joan Loughman and burglarizing the residence she was occupying at the time of her murder. The “murder in the course of a felony” aggravator found by the trial court rests on these separate convictions of robbery and burglary, which satisfies the Sixth Amendment requirements. See Johnson v. State, 969 So.2d 938, 961 (Fla.2007). Thus, we find no merit to this claim.
X. Proportionality
Although Gosciminski does not raise this issue on appeal, the State asserts that the death sentence is proportional in this case. This Court has explained that “a proportionality review is inherent in this Court’s direct appellate review and the issue is considered regardless of whether it is discussed in the opinion or raised by a party.” Patton v. State, 878 So.2d 368, 380 (Fla.2004).
In deciding whether the death sentence is proportional in a particular case, this Court is required to consider the totality of circumstances surrounding the case and compare it to other capital cases. See Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (citing Urbin v. State, 714 So.2d 411 (Fla.1998)); Brown v. State, 721 So.2d 274, 282 (Fla.1998). The purpose of proportionality review by this Court is “to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Parker v. State, 873 So.2d 270, 291 (Fla.2004). Proportionality analysis “is not a comparison between the number of aggravating and mitigating circumstances.” Sexton, 775 So.2d at 935 (citing Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Simpson v. State, 3 So.3d 1135, 1148 (Fla.2009) (quoting Urbin, 714 So.2d at 416).
In the instant case, Gosciminski was convicted of the stabbing/bludgeoning murder of Joan Loughman along with robbery and burglary. The trial court found three aggravators: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder for which Gosciminski was to be sentenced was committed while he was engaged in the commission of a robbery or burglary, which was merged with the pecuniary gain aggravator. The trial court gave each of these aggravators great weight. The court found the statutory mitigator of no significant history of criminal activity and thirteen nonstatutory mitigators, which were given little to moderate weight.
This case is comparable to other cases in which we have upheld the death penalty based upon similar factual circumstances and a weighing of similar aggravating and mitigating circumstances. See, e.g., Duest v. State, 855 So.2d 33, 47-48 (Fla.2003) (holding death penalty proportionate in stabbing death where the court found three aggravators of prior violent felony, murder committed during the course of a robbery merged with pecuniary gain, and HAC versus twelve nonstatutory mitigators); Nelson v. State, 748 So.2d 237, 246 (Fla.1999) (finding death sentence pro *717 portionate in a bludgeoning and stabbing death where the trial court found the three aggravators of HAC, CCP, and committed during the course of a robbery versus one statutory mitigator of age and fifteen non-statutory mitigators); Foster v. State, 654 So.2d 112, 114 (Fla.1995) (holding death penalty proportionate where victim was beaten and stabbed and trial court found the three aggravators of HAC, CCP, and murder in the course of felony versus fourteen nonstatutory mitigators). Thus, we conclude that Gosciminski’s death sentence is proportionate.
CONCLUSION
Based on the analysis above, we affirm Gosciminski’s convictions for first-degree murder, robbery, and burglary and the sentence of death imposed for the murder.
It is so ordered.
LEWIS, QUINCE, LABARGA, and PERRY, JJ, concur.
POLSTON, C.J., and CANADY, J., concur in result.
PARIENTE, J., concurs in result with an opinion.

. Loughman's husband Thomas Loughman described the ring as a two-carat round diamond set in platinum with a diamond baguette on each side.

. At the time of Gosciminski’s initial trial in April 2005, Ben Thomas and Debra Thomas had been married for close to two years. Thomas is Debra Thomas’s maiden name, as well as Ben Thomas's surname.

. Gosciminski had moved to a new residence around the time of Loughman’s murder.

. A State witness testified that he found a fanny pack on February 24, 2003, on Martin Highway right under the overpass of Interstate 95. There was no money in the fanny pack, but there were several credit cards and a checkbook. The fanny pack was identified as Loughman's based on its contents.

. Dr. Diggs suffered a stroke after the first trial and was in ill health at the time of the retrial.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The thirteen nonstatutory circumstances found by the trial court included a life sentence means Gosciminski will never get out of prison; he has orthopedic injuries from a motorcycle accident; he had difficulty coping with the loss of his father from a massive heart attack in 1982; he demonstrated good behavior during his trial; he had a relatively normal upbringing and did not engage in disruptive, disturbed or delinquent behavior as a child or young adult; he has a good work history in the medical field and has been self-employed; he presents with a mixture of disordered personality characteristics; his execution would have a negative effect on his elderly aunt; he served in the Air Force and was honorably discharged; he has demonstrated a positive correctional adjustment; his history does not indicate future dangerousness; he acted as a Good Samaritan by pulling a driver from a burning vehicle after an accident; and the cumulative effect of all the mitigating circumstances.

.Gosciminski asserts the following claims: (1) the trial court erred by allowing Debra Thomas to testify that she moved back with Gosciminski because he had threatened her and her family; (2) the trial court erred by prohibiting the defense from cross-examining Debra Thomas about drug and alcohol use; (3) the trial court erred by permitting Debra Thomas to testify that Gosciminski intercepted her mail, thereby causing her not to get her nursing license in Arizona; (4) the trial court erred in denying Gosciminski's motion for disclosure of Debra Thomas’s grand jury testimony; (5) the trial court abused its discretion in denying Gosciminski’s requested instruction on circumstantial evidence and in *693 overruling his objection to the State's closing argument regarding circumstantial evidence; (6) the trial court improperly limited Gosci-minski’s cross-examination questioning of witness Maureen Reape; (7) the trial court erred by permitting witness Joan Cox to testify that Gosciminski had noticed her diamond ring in 2001; (8) the trial court improperly denied Gosciminski’s motion for judgment of acquittal; (9) the trial court erred in excluding the results of Gosciminski’s polygraph tests, which were exculpatory evidence as to his guilt; (10) and (11) the trial court erred and abused its discretion in allowing testimony and exhibits regarding the coverage of the cell phone towers on the day of the murder; (12) the trial court erred in admitting testimony regarding test drive results (i.e., testimony as to the time it took officers to drive to and from certain locations, including the crime scene, the banks where the deposits were made, and the area where Loughman’s fanny pack was found); (13) the trial court erred in admitting a cash receipt produced by Ben Thomas because it was not properly authenticated; (14) the trial court erred in admitting into evidence two photographs of the victim wearing the jewelry that was taken during the robbery-murder; (15) and (16) the trial court erred in finding the CCP aggravator in this case; (17) the trial court erred in finding the HAC aggravator; and (18) Florida’s death penalty statute is unconstitutional.

. Williams v. State, 110 So.2d 654 (Fla.1959).

. The State introduced Gosciminski's videotaped testimony from the 2005 trial in its case-in-chief in the instant trial.

. Portillo testified that this was the tower and sector on which Gosciminski's cell phone registered three times during the time when Loughman was murdered.

. Detective Thomas Hickox testified that it took him fifty minutes to drive from Gosci-minski's home to the murder scene during the same time of day when the murder occurred. Detective William Hall testified that he was able to drive from the murder scene to the bank in Stuart where Gosciminski made a deposit in forty-two minutes. State Attorney Investigator Edward Arens testified about how long it took him to drive the thirty-five-mile route that Gosciminski testified he drove on the morning of the murder.

. Frye v. United States, 293 F. 1013 (D.C.Cir.1923).

. Section 90.702, Florida Statutes (2009), governs the testimony of experts and provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.

. This standard is commonly known as the Frye test. It was expressly adopted by this Court in Bundy v. State, 471 So.2d 9, 18 (Fla.1985). See Ramirez, 651 So.2d at 1167.

. The committee was tasked with evaluating the effectiveness and utility of the polygraph for security screening at the request of Congress in 2000. Dr. Fienberg testified that the committee members did not include any individuals who would have a vested interest in the outcome of this assessment of the polygraph.

. Dr. Fienberg defined the relevant scientific community as those scientists capable of reading and assessing the validity of the studies related to polygraphs.

. This Court deleted this instruction from the standard instructions in 1981, finding that where the jury is properly instructed on the standard of reasonable doubt, the circumstantial evidence instruction was "confusing and incorrect.” In re Use by Trial Courts of Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 595 (Fla.1981) (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). Since we deleted the instruction on circumstantial evidence from the standard jury instructions, we have consistently found that it is within the trial court's discretion to not give such an instruction. See, e.g., Huggins v. State, 889 So.2d 743, 767 (Fla.2004); Floyd v. State, 850 So.2d 383, 400 (Fla.2002) ("We have previously stated that when proper instructions on reasonable doubt and burden of proof are given, an instruction on circumstantial evidence is 'unnecessary.' ”); Darling v. State, 808 So.2d 145 (Fla.2002); Monlyn v. State, 705 So.2d 1, 5 (Fla.1997).

. "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist. The conclusion as to the ultimate facts must be one which in the common experiences of men may reasonably be made on the basis of the known facts and circumstances.” Davis v. State, 90 So.2d 629, 631 (Fla.1956).