LEVINE, J.
The issue presented is whether the trial court erred in not holding an evidentiary hearing before ordering specific procedures for DNA testing. The procedures include having the evidence in question cut and divided by the state’s expert for the state to retain before appellant’s private laboratory has an opportunity to perform DNA tests. Also at issue is whether the trial court erred in denying appellant’s request to test hairs found on a T-shirt and bedding in the victim’s residence.
We find the trial court erred in allowing the state to cut and withhold certain parts of the evidence in question, without first holding an evidentiary hearing relating to the procedures for DNA testing. At an evidentiary hearing, the testing experts could testify as to the advisability of the proposed splitting procedures and the impact on the likelihood of appellant obtaining a DNA profile from the evidentiary items tested. We also find that the trial court erred in not granting the testing of hairs because, based upon the victim’s testimony, DNA results favorable to appellant *243 would create a “reasonable probability” that appellant would be acquitted or receive a lesser sentence, when considered in conjunction with the other evidence ordered to be tested.
Appellant disputes his identification as the perpetrator of the crimes. The facts of the case can be summarized as follows. The victim awoke to the perpetrator raping her. A struggle ensued and the victim reached for the perpetrator’s hair and pulled his head back. The perpetrator fled. The victim exited her room and told her neighbor that one of the dishwashers at her place of employment had been the perpetrator. Later, when shown pictures of all sixteen dishwashers, she identified appellant. The victim told law enforcement that the T-shirt found on her bed did not belong to her or anyone else she knew. A crime scene technician collected the T-shirt, the victim’s bikini bottom and pajama bottom she was wearing at the time of the assault, the victim’s bed sheet, and hairs from the victim’s bed. Following a rape examination at the hospital, an examiner collected a vaginal swab, fingernail scrapings, and pubic hair combings. The examiner also collected the victim’s clothing and a tampon she was using that night during and after the attack.
Upon returning to her residence, the victim found an unknown toothbrush in her room. The victim’s boyfriend recalled seeing appellant carry a toothbrush or chew on a toothbrush. An analyst later tested the toothbrush and determined that appellant was the source of the DNA on the toothbrush and that only one in 21 quintillion Hispanics would share the same DNA profile.
At trial, appellant’s defense was mis-identification. The jury found appellant guilty of sexual battery and burglary. Subsequently, appellant filed a motion for DNA testing pursuant to Florida Rule of Criminal Procedure 3.853 and section 925.11, Florida Statutes (2008). Appellant filed this motion for testing in order to utilize more sophisticated DNA testing known as “miniSTR,” which is more sensitive at detecting small amounts of DNA, and Y-STR, which amplifies the male chromosome. This testing would be conducted by outside laboratory Orchid Cell-mark, at appellant’s expense, since neither the Palm Beach County Sheriffs Office nor the Florida Department of Law Enforcement is able to perform these types of sophisticated DNA testing. Appellant sought to test the following items: vaginal swabs; fingernail scrapings; the tampon; bathing suit bottoms; sweatpants; pajama bottom; the T-shirt; and hairs found on the T-shirt, bed, fitted sheet, and bed sheet.
The trial court held an evidentiary hearing on whether DNA results favorable to appellant would create a “reasonable probability” that appellant would be acquitted or receive a lesser sentence. See Fla. R.Crim. P. 3.853(c)(5)(C). At this hearing, the associate lab director for Orchid Cell-mark described the testing that her lab could conduct. The victim had testified that she did not have sexual intercourse for a week-and-a-half to two weeks before the incident, and that the victim usually had intercourse in her boyfriend’s room and not in her own room. Based on this testimony, the associate lab director stated that if a male DNA profile were found on the tampon, it would have to be from the perpetrator, and if it did not match appellant, then that would lead to the conclusion that appellant was not the perpetrator in this case.
On the day scheduled for final arguments on the motion for DNA testing, the state “made a decision that we are actually going to agree to testing of some of the *244 items.” However, at this hearing the state introduced a new issue to the trial court:
The last item that I wanted to mention to you that we do appear to have a disagreement on is the fact that in the Defendant’s motion, they are requesting that all of the evidence be transported to Orchid Cellmark with nothing left behind at the P.B.S.O. Lab. After consulting with my expert and given the fact that I have worked on cases in the past, the protocol is not necessarily to ship all of the State’s evidence off to a private lab picked by the defense out of state. If Your Honor deems it helpful, I do have my expert here to talk about the proper protocols, how some samples can be divided where the State can maintain portions of the evidence to be tested without sending the entirety of the evidence. Now, it would be — the State’s position is that that should be within the purview of the scientific experts to decide whether the evidence can be tested and whether the testing would have significance if it’s divided or if that would in any way diminish that. That is something that I believe should be determined by the scientific experts.
The state further expressed concern that the evidence could be consumed by the testing of the outside lab:
But to ship off all of the State’s evidence to an outside lab is — it’s not appropriate.... But, Your Honor, in the event that perhaps in the future, you know, if the testing goes a certain way and Your Honor orders a new trial, if the State has lost all of their evidence or if it has been consumed or if something has happened to it in transport or while it was out of the custody of the State, then it would be an unfair advantage to the defense, Your Honor. And that is why, just in an abundance of caution, we think it important to keep a small sample.
The state admitted at this hearing that whether the evidence could be divided was not a legal issue but rather a scientific issue.
Appellant responded that his “main contention” now was the way that the state sought to divide the evidence. Further, this was the “first time” that appellant’s counsel had heard of dividing the evidence in this manner. In response to the state’s concern about consumption of the evidence, appellant suggested that the trial court “put that in your Order that we would have to then agree if the State looked — went to the lab and looked at the evidence and it was determined that we were going to get like one shot at the evidence, then we would have to agree, you know, on consuming the sample.”
The trial court stated that it was not expecting this issue to be raised at the hearing and further stated that it “might have to have an evidentiary hearing secondary to this evidentiary hearing to determine what is the most appropriate method” regarding the shipping of the materials to an outside agency. The trial court concluded by stating that if it “cannot resolve the differences on paper” from the proposed orders submitted, then it would set “an evidentiary hearing to resolve the proposed Order.” An evidentia-ry hearing was never set on this matter.
Appellant filed a motion detailing the protocols and preservation of DNA evidence at the private laboratory. Appellant argued that the private laboratory needed to review the evidence in its entirety to perform DNA testing; otherwise, potentially exonerating evidence would be unavailable for testing. The state responded by citing to the necessity of retaining portions of evidence for future testing.
The trial court entered a written order granting appellant’s motion for DNA testing for all items requested except the hairs *245 found on the T-shirt and bedding. As to the procedures for testing, the trial court directed all the items be sent to the PBSO crime lab, where a representative of the private laboratory and a PBSO forensic scientist would examine the items for areas most likely to contain DNA. Both representatives would agree on the items to be cut or swabbed and then cut or swab those samples and forward them to Orchid Cell-mark, the private laboratory. The state would retain a portion of each cutting or swab for future testing or use. The trial court allowed the fingernail clippings to be sent in their entirety to the private laboratory, since the state conceded the sample was too small to divide. The order allowed for the presence of the parties’ attorneys during the testing.
Appellant moved for rehearing, arguing that requiring a representative from the private lab to come to the PBSO crime lab would make the cost of private laboratory testing prohibitive. Appellant argued that the plain language of rule 8.853(c)(7) required him to pay only for actual testing, not the safeguard procedures crafted by the trial court. Appellant further argued that the PBSO forensic scientist was not qualified to determine which portions of the evidence should go to Orchid Cellmark, since she was not qualified to perform the two types of testing to be performed by Orchid Cellmark. Finally, appellant argued that the presence of attorneys could contaminate the evidence, and that there was no rule requiring the splitting of evidence.
On rehearing, the trial court found the PBSO forensic scientist qualified to determine which portions of evidence should be sent to Orchid Cellmark. In response to appellant’s claim that having a representative of Orchid Cellmark at the PBSO crime lab was cost prohibitive, the trial court made the presence of that representative optional. Finally, the trial court denied appellant’s request for the entirety of the evidence being sent for testing, without allowing for the presence of the attorneys. As a result, this appeal ensues.
A trial court’s factual findings after an evidentiary hearing on a postconviction motion for DNA testing are reviewed for competent substantial evidence. See Goodwin v. State, 91 So.3d 182 (Fla. 4th DCA 2012). The particular testing procedures adopted by the trial court are reviewed de novo to determine whether they employ a method generally accepted by the scientific community. See Brim v. State, 695 So.2d 268, 274 (Fla.1997).
DNA testing is governed by Florida Rule of Criminal Procedure 3.853 and section 925.11, Florida Statutes. Rule 3.853(c) sets forth the following guidelines for the trial court:
(5) The court shall make the following findings when ruling on the motion:
[[Image here]]
(C) Whether there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.
[[Image here]]
(7) The court-ordered DNA testing shall be ordered to be conducted by the Department of Law Enforcement or its designee, as provided by statute. However, the court, upon a showing of good cause, may order testing by another laboratory or agency certified by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB) or Forensic Quality Services, Inc. (FQS) if requested by a mov-ant who can bear the cost of such testing.
Section 925.11(2)(f)3. through (g) contains nearly identical provisions.
*246 In our analysis, we look to the plain language of rule 3.853(c)(7). Nowhere does this rule appear to authorize the splitting of physical evidence for DNA testing. In fact, the splitting of physical evidence may frustrate the stated intent of the rule, which was promulgated to establish procedures for testing pursuant to sections 925.11 and 925.12. Section 925.11(l)(a)l. allows the defendant to “petition th[e] court to order the examination of physical evidence collected at the time of the investigation of the crime for which he or she has been sentenced that may contain DNA (deoxyribonucleic acid) and that would exonerate that person or mitigate the sentence that person received.” The intent of the statute, and the companion rule, is to establish a methodology for a convicted defendant to have physical evidence examined for possible exoneration or mitigation of sentence.
Further, we find the case of Hooks v. State, 956 So.2d 515 (Fla. 4th DCA 2007), to be most instructive. In Hooks, the defendant objected to the state testing and unavoidably consuming DNA evidence outside the presence of the defense expert and without a video camera to document the state’s actions. The trial court found that the defendant could not have an expert present during the testing due to concerns about potential contamination of the evidence and concerns the crime lab could lose its accreditation. In Hooks, this court recognized that there was “no constitutional violation” since “the unavoidable consumption of evidence during DNA testing” was “done in good faith” and, thus, there was no violation of “due process.” Id. at 516 (citing Gordon v. State, 863 So.2d 1215, 1220 (Fla.2003)) (citing Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). This court recognized that “the better practice is for the Stats to notify the defense of the unavoidable consumption of evidence prior to the testing in order to give the defendant or a representative a fair opportunity to be present during the testing.” Id.
In the present case, it is appellant, not the state, who wants to test the DNA evidence in good faith. The rule that unavoidable and good faith consumption of DNA evidence by the state does not violate due process should apply with equal force to the defense. See generally Delhall v. State, 95 So.3d 134, 162-63 (Fla.2012) (rule governing exclusion of evidence for a discovery violation applies with equal force to the defense and state); Rivera v. State, 670 So.2d 1163, 1165 (Fla. 4th DCA 1996) (prohibition against race-based discrimination applies equally to peremptory challenges exercised by the state and the defense), receded from on other grounds by Foster v. State, 767 So.2d 525 (Fla. 4th DCA 2000). Thus, we find that a defendant may, as a general rule, exhaust DNA in postconviction testing only where, as when done by the state, it is done in good faith. Further, in the present case, appellant agreed to either reach an agreement with the state or come back to the trial court before it sought testing which would potentially consume the DNA evidence.
This court in Hooks determined that an evidentiary hearing was required so that the parties could “demonstrate whether it is practicable to allow videotaping or the presence of a defense expert during the DNA testing process.” 956 So.2d at 516. The court remanded for “an evidentiary hearing that will allow the parties to further develop the record with respect to the contamination, concentration and accreditation issues and, if possible, to develop safeguards that would allow for the presence of a defense expert or videotaping of the testing procedures.” Id. This court concluded that “[t]he parties should have an opportunity to present evidence” on *247 these issues and “the parties should have the chance to establish whether the presence of a video camera or defense expert increases the potential for contamination of the evidence and affects the concentration of the examiner performing the testing procedures.” Id. at 516-17.
In the present case, the parties should get the same opportunity to present evidence and witnesses, and be able to establish whether cutting or splitting the DNA evidence affects the testing or appellant’s ability to present evidence of exoneration or mitigation pursuant to the applicable rule and statute. As noted previously, even the state, at the hearing when the issue was first discussed, admitted that this was an issue that required scientific testimony and was prepared to call a witness regarding this issue. Further, appellant postulated that potentially exonerating or mitigating evidence could very well be present on the material not chosen for testing by the state’s expert. This claim may have merit and should be considered by the trial court at an evidentiary hearing on this particular issue.
We find that before determining that splitting or cutting of DNA evidence was warranted, the trial court should have held an evidentiary hearing where the parties could have presented evidence on the effect of splitting or cutting the DNA evidence. The evidentiary hearing should determine the scientific efficacy of splitting or cutting DNA evidence, as well as consider the possible destruction of DNA evidence by the requested testing.
Finally, we find that the trial court erred in denying the motion to test the hairs found on the T-shirt and bedding. In denying the request to test the hairs, the trial court cited Florida Supreme Court cases affirming the denial of motions for postconviction DNA testing of hairs at crime scenes. We find those cases distinguishable because, unlike in the present case, there was no evidence potentially linking the hairs in those cases to the crimes alleged. See Overton v. State, 976 So.2d 536, 568 (Fla.2007) (defendant did not establish “requisite nexus between the hair and the crime” where “hair could have easily originated from a large number of sources” and there was “no way to determine when, why, where, or how the hairs attached to the tape” that was used on the victim’s body); Lott v. State, 931 So.2d 807, 820-21 (Fla.2006) (defendant failed to offer any reason to suspect hairs were specifically connected to the crime, as “opposed to being hairs left behind by normal guests”); King v. State, 808 So.2d 1237, 1247 (Fla.2002) (impossible to determine when, where, or how hair fragment transferred to victim’s nightgown; victim had dragged herself through the house, been pulled from the house by rescuers, and other personnel had been in the house). Here, in contrast, the victim specifically testified that she pulled on the perpetrator’s hair while he was on her bed. Thus, there is a reason to believe that the hairs on the bed belonged to the perpetrator. Additionally, the T-shirt found on the victim’s bed was likely worn by the perpetrator thus giving rise to the reasonable probability that the hairs on the shirt belonged to him.
Assuming that other evidence to be tested is exculpatory, the hair evidence could buttress the exculpatory nature of that evidence and support a conclusion that appellant was not the perpetrator. By reversing the denial of the testing of the hairs in this case, we need not decide if the hairs in and of themselves give rise to a reasonable probability of acquittal, but when viewed in conjunction with the other evidence, we find that they satisfy the reasonable probability standard.
*248 In conclusion, we reverse and remand for the trial court to hold an evidentiary hearing on the issue of the scope and procedure for testing the items for DNA evidence. We also reverse and remand for DNA testing of the hairs on the T-shirt and bedding.

Reversed and remanded.

GROSS and DAMOORGIAN, JJ., concur.