# Supreme Court of Florida

_____

No. SC17-1928
_____

**ANDREW MICHAEL GOSCIMINSKI,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 20, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying a motion for postconviction DNA testing under Florida Rule of Criminal Procedure 3.853. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution.

## FACTS AND PROCEDURAL HISTORY

Appellant Andrew Michael Gosciminski was indicted, tried, and convicted of robbery with a deadly weapon, burglary of a dwelling with an assault or battery, and first-degree murder of Joan Loughman. *Gosciminski v. State*, 994 So. 2d 1018,

1020 (Fla. 2008). On direct appeal, we found that several rulings by the trial court amounted to prejudicial error. As a result, we reversed Gosciminski's convictions and sentences and remanded for a new trial. *Id.* at 1028.

Following a new trial, Gosciminski was once again convicted and sentenced to death. *Gosciminski v. State*, 132 So. 3d 678, 692 (Fla. 2013). In our opinion affirming Gosciminski's convictions and sentences, we set forth the following facts:

> Joan Loughman flew down to Fort Pierce from Connecticut on September 13, 2002, in order to arrange for her father, Frank Vala, to move into an assisted living facility. Loughman stayed at her father's residence during her visit to Fort Pierce. As was her custom, Loughman wore all of her jewelry daily. This jewelry included a two-carat diamond ring and several other rings, several bracelets, including a diamond tennis bracelet, and earrings with diamonds and emeralds.
> Gosciminski was the director of marketing at Lyford Cove, an assisted living facility. After Loughman met with Gosciminski, her father was admitted to Lyford Cove by Gosciminski on September 18, 2002. The day before the father's admission Gosciminski went to Vala's home to help Loughman move Vala's belongings and furniture to Lyford Cove. However, after being at Lyford Cove for just one night, Vala had to be transferred to the hospital. Vala did not return to Lyford Cove and was subsequently transferred to hospice on September 24, 2002. Loughman arranged to meet Gosciminski at Lyford Cove on the evening of September 23, 2002, in order to pick up her father's belongings. Gosciminski carried Vala's suitcase to Loughman's car. That suitcase was still present in Loughman's rental car, which was parked in the driveway of her father's house, when the police came to investigate her murder on the evening of September 24.
> On the morning of September 24, 2002, Loughman spoke with her twin sister, Janet Vala–Terry, using the telephone at her father's house. This telephone conversation lasted five minutes and ended at

8:47 a.m. when Loughman told her sister that she had to hang up because someone was at the front door. Loughman did not say who was at the door. Loughman was found dead in the bedroom of her father's home on the evening of September 24, 2002, by her sister Janet, her brother, and her brother's wife, who had flown down to Florida in order to meet Loughman at the hospice where Vala had been transferred. Loughman had plans to fly back to Connecticut on September 25, 2002.

On the morning of September 24, 2002, Gosciminski was scheduled to attend a staff meeting at Lyford Cove at 8:00 a.m. However, according to his cell phone records, at 8:15 a.m. Gosciminski called Lois Bosworth, one of the corporate directors of Lyford Cove, to inform her that he would not be able to attend the staff meeting because he was going to Life Care Center in Fort Pierce to make a presentation that morning. Gosciminski arrived at Lyford Cove shortly after lunch on that day. Upon arriving, he met with Debra Flynn, the executive director of the facility, and Nicole Rizzolo, the administrative assistant to Debra Flynn, and showed them a two-carat diamond ring which he removed from a tissue or napkin in his pocket. Gosciminski had talked about buying a ring for his girlfriend, Debra Thomas, for some time before the murder.

Flynn testified that when Gosciminski arrived at Lyford Cove around 1:30 p.m. on the day of the murder he appeared freshly scrubbed and his hair was slick and freshly combed. Flynn also testified that the ring Gosciminski showed her was a white or platinum band with a round diamond center stone and diamond baguettes on each side. Flynn also testified that the ring looked old and dirty and had "something black" on it. Gosciminski also talked to Flynn and Rizzolo about other jewelry he had for Thomas, including a tennis bracelet. Rizzolo testified that Gosciminski came to work sometime after lunch and that he looked like he had just showered and his skin was "scrubbed pink." Gosciminski also showed Rizzolo the ring and mentioned a tennis bracelet. On cross-examination, defense counsel pointed to Rizzolo's deposition in which she had stated that Gosciminski had shown her the ring before the day of Loughman's murder. Rizzolo stated that although she had said that in her deposition, she was sure that Gosciminski had shown her the ring after Loughman's murder.

Until a short time before the murder, Gosciminski was dating and living with Debra Thomas. Debra Thomas started having an

affair with Ben Thomas in July 2002. At that time, Ben Thomas had been married to Deborah Pelletier for five years and lived with Pelletier in a home on Import Drive in Port St. Lucie. Around the last week of July 2002, Debra Thomas and Ben Thomas moved into the house on Import Drive. One week later, both Debra Thomas and Ben Thomas moved out and Deborah Pelletier moved back into the house. Ben Thomas moved to another house by himself and Debra Thomas moved back with Gosciminski.

During the investigation, Detective Thomas Hickox learned that Gosciminski had been with Loughman the evening before the murder. On October 1, 2002, Detective Hickox went to Lyford Cove to talk to Debra Flynn and Gosciminski. On October 2, 2002, Detective Hickox called Gosciminski to the police station for a recorded interview, in which Gosciminski participated voluntarily. At the same time, two other officers were sent to the new home of Debra Thomas and Gosciminski to question Thomas about Loughman's murder. The detectives asked Thomas about the engagement ring Gosciminski had given her. Thomas stated that it was the same engagement ring Gosciminski had given her during their previous engagement in 2001. At trial, Thomas testified that she had not told the detectives the truth about the ring because she was afraid. She also testified that after the officers left, she got a phone call from Gosciminski stating that they had to get rid of the ring because it was "hot." After Gosciminski returned home, he took the ring and went out toward the beach. Thomas has not seen the ring since that day.

Gosciminski was arrested on October 3, 2002, and indicted for the crimes on October 22, 2002. A few weeks later, Deborah Pelletier's father found a bag of jewelry in the shed behind Pelletier's house on Import Drive. The jewelry, which was found inside a Geoffrey Beene cologne pouch, included two sets of earrings, a ring, and a diamond and emerald tennis bracelet. The jewelry was identified as the jewelry owned by Loughman and missing from her body after she was murdered. Pelletier testified that in the beginning of August Gosciminski had come over to her Import Drive house several times a week in order to discuss the affair between Debra Thomas and Ben Thomas. Gosciminski also went to Pelletier's house sometime in August when Pelletier's water was not working. Gosciminski had accompanied Pelletier to fix something near the shed where the jewelry was later found. Pelletier also testified that on one occasion after October 2, 2002, but before the jewelry was found, Ben

Thomas came over to the house with a group of friends to remove his belongings from the house and garage. Pelletier had visited Gosciminski in jail. When Pelletier told him about the jewelry found in her shed, Gosciminski said "it's over, I'm done" and told Pelletier not to visit him again.

At trial, the State called numerous witnesses, including detectives who had examined the crime scene and who were involved in the investigation, and Loughman's family members who knew about the jewelry she wore and who had talked to her while she was in Florida. The State also called witnesses who had seen the ring that Gosciminski gave Debra Thomas on the evening of September 24, 2002, and who had identified the ring they saw in a lineup. The detectives who were involved with the investigation testified that they took fingerprints from the Vala residence as well as both of Gosciminski's residences and his truck, but did not find any matching fingerprints or any other scientific or forensic evidence to link Gosciminski to the crime.

Debra Thomas testified that on the morning of September 24, 2002, Gosciminski left their home sometime between 7 and 8 a.m. and came back home around lunch time. She testified that she was not sure exactly what time Gosciminski came home because she was not aware that he had returned home as he did not enter through the front door. She stated that it could have been between 11 a.m. and 1 p.m. Thomas first noticed Gosciminski was home when she saw him in the master bathroom. She saw Gosciminski washing up at the bathroom sink and noticed that he had blood on the right side of his arm. She also saw a pile of Gosciminski's clothes on the floor that were soiled with blood. When Thomas questioned Gosciminski about the bloody clothes, he explained that he had gone to collect some money for a friend in West Palm Beach and had to "rough some guy up." On cross-examination, defense counsel asked Thomas about her deposition statements regarding the time Gosciminski came home. In her deposition, Thomas had stated that Gosciminski came home around 1 p.m. and left at 3 p.m. Thomas responded that defense counsel had badgered her into stating this time frame at the deposition and that she was not sure about the exact time of Gosciminski's arrival, but it was around lunchtime. Thomas also testified that Gosciminski gave her an engagement ring on the evening of September 24, 2002. She described the ring as a large diamond with baguettes on each side set in a white gold or platinum band. She

described the condition of the ring as being rather dull, as if it needed to be cleaned.

Nextel engineer Juan Portillo testified at the trial about Gosciminski's cell phone activity and created a cell phone tower diagram, which indicated the area in which Gosciminski was located during his phone calls on the morning of September 24, 2002. Gosciminski's cell phone records indicated that he had cell phone activity between 6:31 a.m. and 8:25 a.m. His last call at 8:25 a.m. was an inbound call that lasted twelve minutes, eleven seconds. There was no activity on his phone from 8:37 a.m. until 9:12 a.m. According to the cell tower diagram and which cell tower the call hit, Gosciminski received a call at 9:12 a.m. while he was located in an area close to the Vala residence where Loughman was murdered. Two other phone calls, one at 9:27 a.m. when Gosciminski accessed his voicemail and one at 9:28 a.m. when he made an outbound call, also hit the cell tower close to the Vala residence. The next phone call at 10:23 a.m. hit a cell tower close to the Harbor Federal Bank in Palm City. The evidence also showed that on the morning of the murder Gosciminski made a cash deposit of $430 at this particular bank at 10:08 a.m. The next phone call at 10:36 a.m. hit a cell tower in the vicinity of where Loughman's fanny pack was later found. Evidence also showed that a fifty-seven dollar check made out to Gosciminski's mother was deposited by Gosciminski at 11:04 a.m. at another Harbor Federal Bank located at Darwin Square. The last two phone calls at 11:29 a.m. and 11:39 a.m. hit cell towers in the vicinity of where Gosciminski lived.

Associate medical examiner Dr. Linda Rush O'Neill testified in the place of Dr. Charles Diggs, the medical examiner who had conducted the autopsy and testified at the first trial. In preparation for her testimony, Dr. O'Neill reviewed the medical examiner's file, which included the autopsy report, diagrams, and notes, the testimony and deposition of Dr. Diggs, the crime scene photographs, and the autopsy photographs. According to Dr. O'Neill's medical testimony, Loughman suffered three different types of injuries: blunt force trauma bruising and lacerations, incise or stab wounds, and abrasions or scraping. The fatal injury was a cut to Loughman's throat with a knife or knife-like object that severed the left jugular vein and caused her to bleed out. Loughman was first attacked in the hallway, as indicated by blood in the hallway and her eyeglasses that were apparently knocked from her face. She was then dragged into a

bedroom by her feet, where she was severely bludgeoned with an ashtray stand statue, stabbed (possibly with sharp pieces of the glass ashtray statue based on a piece of glass that was removed from the back wound during the autopsy), and cut in the throat. Loughman also suffered lacerations and bruising to her face and head, fractures to the bones of her face, including her jaw from which four teeth were dislodged by the root. The dislodged teeth indicated that significant force was used in the blunt trauma to the head. Loughman also had stab wounds on the back of her neck, her right back torso, and her left chest. The stab wound to Loughman's back torso perforated the right lung. At some point in the attack, Loughman suffered a defensive wound to her left hand, indicating that she was conscious during some of the attack. The variety of wounds and their placement on both the front and back of Loughman's body also indicated that she was conscious and struggling with her attacker. The bludgeoning injuries were consistent with someone using the ashtray statue that was found at the scene as a weapon. The stabbing or sharp force wounds could have been inflicted with a knife or one of the broken pieces of glass from the statue. The stabbing wounds were "somewhat irregular" and not like the margins that would occur with a stab wound from an ice pick or knife. Dr. O'Neill opined that the defensive wound on Loughman's left hand was caused by a portion of the broken statue. The body temperature of the victim, the rigor mortis, and the livor mortis were consistent with Loughman being killed between 8:47 a.m. and 10:30 a.m. on September 24. Based on the scene and the injuries to the victim, Loughman's attacker would have blood on his clothing and body.

*Id.* at 688-92 (footnotes omitted). After the penalty phase, the jury recommended a death sentence by a vote of nine to three. *Id.* at 692. The trial court followed the

jury's recommendation and imposed a death sentence, finding three aggravators,[1]

one statutory mitigator,[2] and thirteen nonstatutory mitigators.[3]  *Id.*

In his direct appeal, Gosciminski raised 18 issues.[4]  *Id.*  We found all but one

to be without merit and determined that any error was harmless.  *Id.* at 693.

_____

1.  The trial court found the following three aggravators: (1) the murder was cold, calculated, and premeditated (CCP) (great weight); (2) the murder was heinous, atrocious, or cruel (HAC) (great weight); and (3) the murder was committed during the commission of a robbery or burglary (great weight), merged with committed for pecuniary gain aggravator.  *Id.*

2.  The trial court found one statutory mitigator: that Gosciminski had no significant history of criminal activity (some weight).  *Id.*

3.  The trial court found the following nonstatutory mitigators:

[A] life sentence means Gosciminski will never get out of prison; he has orthopedic injuries from a motorcycle accident; he had difficulty coping with the loss of his father from a massive heart attack in 1982; he demonstrated good behavior during his trial; he had a relatively normal upbringing and did not engage in disruptive, disturbed or delinquent behavior as a child or young adult; he has a good work history in the medical field and has been self-employed; he presents with a mixture of disordered personality characteristics; his execution would have a negative effect on his elderly aunt; he served in the Air Force and was honorably discharged; he has demonstrated a positive correctional adjustment; his history does not indicate future dangerousness; he acted as a Good Samaritan by pulling a driver from a burning vehicle after an accident; and the cumulative effect of all the mitigating circumstances.

*Id.* at 692 n.8.

4.  Gosciminski raised the following claims on direct appeal:

(1) the trial court erred by allowing Debra Thomas to testify that she moved back with Gosciminski because he had threatened her and her

family; (2) the trial court erred by prohibiting the defense from cross-examining Debra Thomas about drug and alcohol use; (3) the trial court erred by permitting Debra Thomas to testify that Gosciminski intercepted her mail, thereby causing her not to get her nursing license in Arizona; (4) the trial court erred in denying Gosciminski's motion for disclosure of Debra Thomas's grand jury testimony; (5) the trial court abused its discretion in denying Gosciminski's requested instruction on circumstantial evidence and in overruling his objection to the State's closing argument regarding circumstantial evidence; (6) the trial court improperly limited Gosciminski's cross-examination questioning of witness Maureen Reape; (7) the trial court erred by permitting witness Joan Cox to testify that Gosciminski had noticed her diamond ring in 2001; (8) the trial court improperly denied Gosciminski's motion for judgment of acquittal; (9) the trial court erred in excluding the results of Gosciminski's polygraph tests, which were exculpatory evidence as to his guilt; (10) and (11) the trial court erred and abused its discretion in allowing testimony and exhibits regarding the coverage of the cell phone towers on the day of the murder; (12) the trial court erred in admitting testimony regarding test drive results (i.e., testimony as to the time it took officers to drive to and from certain locations, including the crime scene, the banks where the deposits were made, and the area where Loughman's fanny pack was found); (13) the trial court erred in admitting a cash receipt produced by Ben Thomas because it was not properly authenticated; (14) the trial court erred in admitting into evidence two photographs of the victim wearing the jewelry that was taken during the robbery-murder; (15) and (16) the trial court erred in finding the CCP aggravator in this case; (17) the trial court erred in finding the HAC aggravator; and (18) Florida's death penalty statute is unconstitutional.

*Id.* at 692 n.9.

Following our affirmance of his convictions and sentences, Gosciminski petitioned for a writ of certiorari, which the United States Supreme Court denied. *Gosciminski v. Florida*, 135 S. Ct. 57 (2014) (mem.).

Gosciminski filed his initial 3.851 postconviction motion on September 30, 2015. On February 17, 2016, Gosciminski sought leave to amend his motion in light of *Hurst v. Florida*, 136 S. Ct. 616 (2016). After finding several of the claims insufficiently pled, the trial court granted Gosciminski the opportunity to amend the motion and include a *Hurst* claim. On February 16, 2016, Gosciminski moved for the trial court judge's recusal, which was denied. Gosciminski filed a motion for rehearing, which was also denied.

While litigating the postconviction motion, Gosciminski filed a motion for DNA testing of evidence pursuant to Florida Rule of Criminal Procedure 3.853. The circuit court considered the pleadings and held an evidentiary hearing on June 30, 2017. Following the hearing, the circuit court entered an order granting in part and denying in part Gosciminski's motion for DNA testing. In support of its conclusions, the court "specifically incorporate[ed] by reference the State's written closing argument, and adopt[ed] the State's reasoning and/or lack of objection."

Gosciminski filed a motion for rehearing, which the circuit court denied. The court also considered Gosciminski's request for protection of the evidence to be tested and ordered the parties to address those concerns in their "plan for release

- 10 -

and submission of the evidence to FDLE." Gosciminski now appeals the circuit court's partial denial of his 3.853 motion to this Court, raising three issues: (1) the circuit court erred in adopting the State's closing memorandum in its order; (2) the order fails to protect Gosciminski's rights where it does not address logistics and handling of the evidence; and (3) the partial denial of Gosciminski's motion violates his Fifth, Eighth, and Fourteenth Amendment rights. For the reasons that follow, we find that all of Gosciminski's claims are without merit and affirm the circuit court's order.

## ANALYSIS

As his first claim, Gosciminski contends that the circuit court erred in adopting the State's closing memorandum without making independent findings as required by rule 3.853. Gosciminski claims that the State's memorandum sets forth contradictory and unsubstantiated arguments, and the circuit court's adoption of this memorandum denies Gosciminski meaningful appellate review.

A circuit court's findings on a postconviction motion for DNA testing following an evidentiary hearing are reviewed under the competent substantial evidence standard. *Kelley v. State*, 974 So. 2d 1047, 1051 (Fla. 2007) (citing *Stephens v. State*, 748 So. 2d 1028 (Fla. 1999)). Whether the movant met the pleading requirements for DNA testing is subject to de novo review. *Consalvo v. State*, 3 So. 3d 1014, 1015-16 (Fla. 2009). The testing procedures the circuit court

- 11 -

adopted are also reviewed de novo to determine whether they employ a method generally accepted by the scientific community. *Brim v. State*, 695 So. 2d 268, 274 (Fla. 1997).

Under rule 3.853, a motion for postconviction DNA testing must include:

> (1) a statement of the facts relied upon in support of the motion, including a description of the physical evidence containing DNA to be tested and, if known, the present location or last known location of the evidence and how it originally was obtained;

> (2) a statement that the evidence was not previously tested for DNA, or a statement that the results of previous DNA testing were inconclusive and that subsequent scientific developments in DNA testing techniques likely would produce a definitive result establishing that the movant is not the person who committed the crime;

> (3) a statement that the movant is innocent and how the DNA testing requested by the motion will exonerate the movant of the crime for which the movant was sentenced, or a statement how the DNA testing will mitigate the sentence received by the movant for that crime;

> (4) a statement that identification of the movant is a genuinely disputed issue in the case and why it is an issue or an explanation of how the DNA evidence would either exonerate the defendant or mitigate the sentence that the movant received;

> (5) a statement of any other facts relevant to the motion; and

> (6) a certificate that a copy of the motion has been served on the prosecuting authority.

Fla. R. Crim P. 3.853(b). After ordering and receiving the State's response, the circuit court "shall . . . enter an order on the merits of the motion or set the motion for hearing." Fla. R. Crim. P. 3.853(c)(3). In considering a rule 3.853 motion for

- 12 -

DNA testing, a court must make the following findings as to each piece of evidence:

>    (A) Whether it has been shown that physical evidence that may contain DNA still exists.

>    (B) Whether the results of DNA testing of that physical evidence likely would be admissible at trial and whether there exists reliable proof to establish that the evidence containing the tested DNA is authentic and would be admissible at a future hearing.

>    (C) Whether there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.

Fla. R. Crim. P. 3.853(c)(5). In the instant case, Gosciminski sought the testing of over 40 pieces of evidence. Specifically, Gosciminski requested testing of the following:

1. FPPD-11, swabbing from north bathroom floor (item 11)

2. FPPD-18, hair from the bathroom (item 18)

3. FPPD-20, hair from shower floor in master bathroom (item 20)

4. FPPD-19, hair from base of statute (exhibit 61)

5. FPPD-111, key ring with keys (Exhibit 48)

6. FPPD-31, key ring with keys (Exhibit 50)

7. IRCL-65, section of broken white glass (Exhibit 65)

8. IRCL-66, section of broken white glass (Exhibit 66)

9. IRCL-67, section of broken white glass (Exhibit 67)

10. IRCL-70, section of broken white glass (Exhibit 70)

11. IRCL-71, sections of statue body (Exhibit 71)

12. IRCL-72, sections of statue and base (Exhibit 72)

13. IRCL-73, metal support ring (Exhibit 73)

14. IRCL-74, section of statue head (Exhibit 74)

15. IRCL-75, eleven manila packets with sections of statue (Exhibit 75A-K) (75C)

16. IRCL-76, thirteen manila packets with sections of statue (Exhibit 76A-M; M is a piece of jewelry) (76I, 76J, 76K, 76L, 76M)

17. Swabbings from the twelve bloodstains on the walls of the home[5]

As the basis for testing, Gosciminski argued that there is more sensitive testing available today that may be able to develop a DNA profile if each item is sent through the amplification and electrophoresis stages. In response, the State contended that the evidence had either been previously tested or contaminated. The circuit court held a hearing on Gosciminski's motion on June 30, 2017. After the hearing, the circuit court issued its order:

---

5. While Gosciminski's initial motion for DNA testing requested testing of these swabs, Gosciminski now acknowledges that they have not been located. Gosciminski contends that while he is unable to establish the requisite facts at this time to support his rule 3.853 claim for any potential swabbings of stains, he does not waive any future motion for postconviction DNA testing of these swabbings should more information develop.

- 14 -

The court has considered the DNA evidentiary hearing evidence and testimony, and all of the written pleadings cited above. The court specifically incorporates by reference the State's written closing argument, and adopts the State's reasoning and/or lack of objection in granting or denying DNA testing as follows:

It is ORDERED THAT:

1. STR-DNA testing by FDLE is granted on IRCL Exhibits 67, 70, 71, 72, 75C, and 76I-M.

2. DNA testing by Bode Labs is denied.

3. DNA testing on all other items of evidence is denied.

4. Within 30 days, the State must provide the court a written plan agreed upon by the parties, and coordinated with any affected agency, for release and submission of evidence to FDLE. The plan must include timeframes and an estimate of the date when testing will be completed by FDLE. The plan must be accompanied by any required proposed orders.

5. After the plan is submitted, a brief telephone hearing will be conducted if requested.

Now before this Court, Gosciminski's primary argument is that the circuit court, in adopting the State's closing memorandum and its reasoning, did not make independent findings under rule 3.853. However, as noted by the State, this Court has previously found that a court did not err in adopting the State's closing memorandum. *See Pietri v. State*, 885 So. 2d 245, 270 (Fla. 2004) (finding that the trial court did not err in adopting the State's closing argument where the memo "demonstrate[ed] that it [was] not facially deficient and the conclusions therein are

- 15 -

supported by the record"). Similarly, in the present case, the State's memorandum is not facially deficient and its conclusions are supported by the record evidence. Thus, the circuit court did not err in adopting the State's reasoning and lack of objection to the testing of certain items. Accordingly, we affirm the trial court's order, as it properly denied in part and granted in part Gosciminski's motion.

A circuit court, in ruling on a rule 3.853 motion, must first determine if "it has been shown that physical evidence that may contain DNA still exists." Fla. R. Crim. P. 3.853(5)(a). In the present case, the evidence listed in Gosciminski's motion falls into one of three categories: (1) evidence that has never been tested;[6] (2) evidence that was tested and extracts were obtained but no amplification or electrophoresis was conducted;[7] and (3) evidence that was tested and provided a quantitation value of "none."[8] The vast majority of the evidence falls into the third category, as most of the evidence was tested and halted at the second stage, quantitation, because it did not meet the minimum threshold required by the Indian

---

6. FFPD-111, 76I, 76J, 76K, 76L, 76M

7. IRCL-67, IRCL-70, IRCL-71, IRCL-72, IRCL-75C

8. FFPD-11, FFPD-18, FFPD-20, FPPD-19, FPPD-31, IRCL-65, IRCL-66, IRCL-73, IRCL-74, IRCL-75a, IRCL-75b, IRCL-75d-k, IRCL-76a-h.

River Crime Laboratory (IRCL) in order to proceed to the amplification and electrophoresis stages.

Despite this, Gosciminski requests that all the evidence should be tested again in the hopes that with advancements in testing, DNA profiles may be discovered. However, this is not the standard set forth by rule 3.853. Instead, the evidence must have never been tested previously or tested with results that were inconclusive. Here, the evidence was tested and could not proceed through the other stages of testing because they did not meet the minimum threshold required by the IRCL. Notably, Gosciminski did not provide any case law that would support his contention that he is entitled to the retesting of evidence under these circumstances. Only items 76I, 76J, 76K, 76L, 76M, which had never been tested, would satisfy the requirements of rule 3.853(b)(2).

Nevertheless, the State acquiesced to the testing of five additional items,[9] presumably because under current testing standards enough DNA was present at the quantitation stage to move forward to the amplification and electrophoresis stages.[10] These five items, along with the five items that had never been tested,

_____

9. IRCL-67, IRCL-70, IRCL-71, IRCL-72, IRCL-75C

10. DNA analyst Leslie Perrone testified during the evidentiary hearing that based on present day protocols, the IRCL requires .004 nanograms/microliter before sending the sample for amplification and electrophoresis. The only items that would satisfy the current protocols are IRCL-67 (quantitation value: .004 nanograms), IRCL-70 (quantitation value: .004 nanograms), IRCL-71 (quantitation

- 17 -

were approved for testing by the circuit court. Because these items are the only ones that could possibly contain relevant DNA evidence, these items would be the only ones eligible for DNA testing. The State's memorandum, which conceded to the testing of these items, is supported by the record. Therefore, the circuit court did not err in adopting the State's reasoning and conclusions as to Gosciminski's motion and we affirm the court's order.

For his second claim, Gosciminski argues that the circuit court's order fails to protect his due process rights because it does not list any procedures concerning the transportation, handling, and consumption of evidence. The order states that

> [w]ithin 30 days, the State must provide the court a written plan agreed upon by the parties, and coordinated with any affected agency, for release and submission of evidence to FDLE. The plan must include timeframes and an estimate of the date when testing will be completed by FDLE. The plan must be accompanied by any required proposed orders.

According to Gosciminski, this constitutes error pursuant to *Cardona v. State*, 109 So. 3d 241 (Fla. 4th DCA 2013), wherein the Fourth District Court of Appeal held that it was reversible error for the circuit court to order specific procedures for DNA testing without first holding an evidentiary hearing. *Id.* at 248.

---

value: .004 nanograms), IRCL-72 (quantitation value: .007 nanograms), IRCL-75 (quantitation value: .006 nanograms).

As noted by the State, this issue is not ripe for review. The circuit court did not order any specific procedures for the testing of the items set forth in the order. Instead, the court ordered the State to provide a written plan agreed upon by the parties that would outline when the evidence would be released and submitted to FDLE. This plan would require timeframes and an estimated date of completion. Because the proposal has not even been written by the State, let alone approved by the parties and the trial court, this claim is premature. Accordingly, we find that Gosciminski's claim as to the procedure for testing the DNA evidence is without merit.

Finally, Gosciminski claims that the circuit court's denial of his rule 3.853 motion violated his substantive and procedural due process rights. This claim is also without merit. "A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) (reversing the Ninth Circuit's conclusion that a state prisoner had a due-process right to access DNA evidence in a postconviction proceeding analogous to the right to be provided with exculpatory evidence prior to trial under *Brady*). There, the Supreme Court held that a state prisoner had no substantive due process right to postconviction access to the State's evidence so that he could apply new DNA testing technology that might prove his innocence. *Id.* at 72. Later, in *Skinner v. Switzer*, 562 U.S. 521, 535

- 19 -

(2011), the Court reiterated that "*Osbourne* . . . rejected substantive due process as a basis for [DNA testing] claims," and went on to extend its holding in *Osbourne* to capital cases. Therefore, Gosciminski does not have a substantive due process right to DNA evidence.

Neither does Gosciminski have a meritorious claim that his procedural due process rights were violated. Gosciminski was afforded all the procedure required under rule 3.853, as he was provided notice and an opportunity to be heard. *See Lambrix v. Jones*, 227 So. 3d 550, 556-57 (Fla. 2017) (finding inmate's two unsuccessful attempts to obtain DNA testing and subsequent appellate review established that he had "not been denied the opportunity to claim any constitutional right, nor has any right been denied to him without full consideration and review"). Here, Gosciminski was afforded the opportunity to plead for DNA testing and an evidentiary hearing was granted where he was provided the opportunity to present evidence. Accordingly, Gosciminski fails to establish that his procedural due process rights were violated, therefore this claim is denied.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's order granting in part and denying in part Gosciminski's motion for DNA testing.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.

- 20 -

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for St. Lucie County,
Robert E. Belanger, Judge - Case No. 562002CF003515AXXXXX

Neal Dupree, Capital Collateral Regional Counsel, Brittney Nicole Lacy, Staff Attorney, and Marie-Louise Samuels Parmer, Special Assistant Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

for Appellee